UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

STEMCOR USA, INC.                           CIVIL ACTION

VERSUS                                      NO: 12-2966 , c/w
                                            12-2968

AMERICA METALS TRADING, LLP                 SECTION: R
and CIA SIDERURGICA DO PARA
(COSIPAR)

**THIS DOCUMENT RELATES TO ALL CASES**

**ORDER AND REASONS**

Plaintiff in intervention ThyssenKrupp Mannex GMBH ("TKM") moves the Court to vacate all maritime and state law attachments of the *res* in these consolidated cases--9,000 metric tons of pig iron aboard the M/V CLIPPER KASASHIO--and transfer the proceeds of a court-ordered sale of the *res* to the 24th Judicial District Court ("JDC") for Jefferson Parish.[1] According to TKM, the initial attachments purporting to establish federal jurisdiction over the *res* were void for lack of subject matter jurisdiction, and the first valid attachment orders were issued by the 24th JDC and perfected by service by the Jefferson Parish Sheriff.  Therefore, TKM contends, the state court obtained exclusive jurisdiction over the *res* and all subsequent federal court actions were taken without jurisdiction.  For the following reasons, the Court grants the motion.

---

[1] R. Doc. 436.

## I.   BACKGROUND

In this action, several plaintiffs assert claims against defendants American Metals Trading, LLP ("AMT"), a British entity, and Cia Siderurgica do Para ("COSIPAR"), a company existing under the laws of Brazil.  According to plaintiffs, COSIPAR produces pig iron, and AMT sells the product to buyers on COSIPAR's behalf.  Plaintiffs allege that defendants have failed to deliver on a number of their contracts, causing each plaintiff to sustain significant damages.  In an effort to obtain security for existing and/or anticipated judgments against defendants, each plaintiff filed a complaint in the United States District Court for the Eastern District of Louisiana.  Plaintiffs also moved for and obtained Rule B maritime attachments and/or Louisiana state law attachments of 9,000 metric tons of pig iron aboard the M/V CLIPPER KASASHIO.  This pig iron is also subject to attachment and sequestration orders issued by the 24th JDC for Jefferson Parish, and the resulting jurisdictional conflict underlies TKM's motion to vacate federal attachments and transfer the *res* to state court.

### A.   Parties and Factual Background

###### 1.   Stemcor

Plaintiff Stemcor USA, Inc. is a Delaware corporation.  In 2012, Stemcor entered into two contracts with defendant AMT for the purchase, sale, and delivery of pig iron from Brazil to New Orleans, Louisiana.[2]  Both contracts specified the quantity of pig iron to be purchased and the price per metric ton.[3] Under both contracts, the sale was to be "DDP, discharged into barges, New Orleans, LA."[4]  DDP is the international trade term for "delivery duty paid," which "means that the seller delivers the goods when the goods are placed at the disposal of the buyer, cleared for import on the arriving means of transport ready of unload at the named placed of destination."[5]  Thus, under the agreements, AMT was responsible for arranging for ocean transport of the pig iron and delivery to New Orleans.  Both of the Stemcor-AMT contracts required AMT to charter a vessel to make the shipment, specified certain minimum vessel requirements, and permitted Stemcor to reject any proposed

---

[2] R. Doc. 83 at 2 ¶ 9, 3 ¶ 15.

[3] R. Doc. 441-1 at 1, 14.

[4] *Id.*

[5] R. Doc. 441-1 at 10 ("ICC Guide to Incoterms 2010," published by the International Chamber of Commerce).

vessel that failed to satisfy the contract's terms.[6]  Both contracts also specified that Stemcor's obligation to make final payment for the pig iron was triggered by AMT's presentation of proof of marine insurance, shipping documents issued by the shipping/freight forwarding company, and other documents.[7] Finally, the contracts contained a section entitled "SHIPPING/LOAD CONDITIONS," which required AMT to, among other things, notify Stemcor when the chartered vessel departed the load port[8] and pay "all local taxes, dockage, quay dues, port rates, agency fees and levies assessed on the vessel."[9]

The contracts also called for arbitration of disputes between Stemcor and AMT.  The applicable provision of both contracts provides: "[a]ny dispute shall be referred to arbitration under the rules of the [London Court of International Arbitration].  A single arbitrator is to be agreed between the parties failing which the arbitrator is to be appointed by the LCIA."[10]

---

[6] *See id.* at 5 ("The seller to charter a single deck bulk-carrier with engine/bridge aft, larktop strengths minimum 15 mt/sqm, hydraulic folding hatch covers, classed LR 100A1 or equivalent . . . , maximum 20 years old.  The hatch openings are to be at least 12M long."); *id.* at 17 (same).

[7] *Id.* at 3-4, 16-17.

[8] *Id.* at 5 ¶ 3, 17 ¶ 3.

[9] *Id.* at 5 ¶ 5, 18 ¶ 5.  Stemcor agreed to pay discharge costs and levies on the cargo.  Overtime pay for officers and crew were to be paid by AMT, while overtime costs ordered by port authorities would be shared equally between the parties.

[10] *Id.* at 7, 25.

Stemcor alleges that it provided AMT with $2,346,000 in prepayments under the first contract, dated April 3, 2012.[11]  According to Stemcor, AMT made partial shipments of pig iron under the contract, deducting the costs of those shipments from the prepayment amount, but it failed to deliver the total quantity of pig iron provided under the agreement.[12]  As to the second contract, dated, May 11, 2012, Stemcor alleges that it provided AMT with $2,340,900 in prepayments for the specified quantity of pig iron.[13] AMT again made partial payments and deducted the costs from Stemcor's prepayment, but it failed to deliver the remainder of the cargo.[14]  Stemcor asserts breach of contract claims against AMT, as well as cargo damage claims for "off-spec and/or damaged pig iron shipments."[15]

### 2.   Daewoo

Plaintiff Daewoo International Corporation is a trading company incorporated under the laws of South Korea.  Like Stemcor, Daewoo entered

---

[11] R. Doc. 83 at 3 ¶ 11.

[12] *Id.*

[13] *Id.* at 4 ¶ 17.

[14] *Id.*

[15] *Id.* at 5 ¶ 24.

into a number of purchase and sale contracts with AMT.[16]   Under these

contracts, AMT agreed to sell pig iron to Daewoo.[17]   The contracts specified a

delivery term of "DDP, New Orleans."[18]   They also established a payment

schedule.   AMT would receive a first provisional payment upon providing

Daewoo with, among other things, an "Original Forward Certificate Receipt"

issued by a freight forwarding company, indicating that AMT had delivered the

cargo to the forwarder for shipment to Daewoo.   Title to the pig iron passed

from AMT to Daewoo upon AMT's production of the Forward Certificate

Receipt, but AMT bore the risk of loss until the point of delivery in New

Orleans.   Daewoo would make a second provisional payment to AMT within

seven days of the shipment date, and it would make its final payment once the

pig iron was delivered and unloaded in New Orleans.[19]

Like the Stemcor-AMT agreements, Daewoo's contracts with AMT

provided for binding arbitration.   Specifically, the contracts stated:

> any controversy or claim arising out of or relating to the
> Agreement, or the breach thereof, shall be settled by arbitration
> administered by the American Arbitration Association under its
> Commercial Arbitration Rules in New York, USA, and judgment

---

[16] R. Doc. 441-1 at 29.

[17] *Id.* at 29 ¶ 1, ¶ 3 (specifying quantity and price terms).

[18] *Id.* at 1 ¶ 4.

[19] *Id.* at 30-31.

on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.[20]

Daewoo alleges that between June and September 2012, it provided first provisional payments to AMT in the aggregate amount of $14,479,638.97.[21] Nonetheless, AMT allegedly failed to deliver any pig iron to Daewoo.[22] According to Daewoo, AMT arranged for a freight forwarding company to produce a sham Forward Certificate Receipt to deceive Daewoo into making these payments, even though AMT had no intention of shipping the pig iron cargo.[23]  Daewoo asserts claims against AMT for breach of contract.[24]

### 3.    TKM

Intervening plaintiff TKM is a corporation existing under the laws of Germany.  Between June 2010 and February 2011, TKM entered into six contracts with defendant AMT for the purchase and sale of pig iron.[25]

---

[20] *Id.* at 32 ¶ 10.

[21] EDLA Civil Action No. 12-2968, R. Doc. 8 at 8 ¶ 29.

[22] *Id.* at 8 ¶ 30.

[23] *Id.* at 9 ¶ 33.

[24] *Id.* at 11 ¶ 43.

[25] R. Doc. 64-3 at 6 ¶ 16.

Although TKM provided AMT with $32,420,809.38 in prepayments, AMT allegedly breached the contracts by failing to deliver any of the purchased pig iron.[26]  Following extensive negotiations, the parties reached a settlement agreement on February 2, 2012.[27]  Under the agreement, AMT, COSIPAR, and another entity, Usina Siderurgica do Para Limitada ("USIPAR"), acknowledged liability to TKM, agreed to pay the obligation in a number of quarterly installments, and pledged a quantity of its pig iron to TKM as security.[28]

TKM alleges that defendants have defaulted on the settlement agreement through nonpayment.[29]  TKM further alleges that it enforced the pledge in its favor by causing two Brazilian courts to attach quantities of pig iron belonging to COSIPAR in Brazil.[30]  According to TKM, the 9,000 metric tons of pig iron aboard the M/V CLIPPER KASASHIO is part of the property covered by TKM's pledge and subject to attachment orders and liens in

---

[26] *Id.*

[27] *Id.* at 6 ¶ 17.

[28] *Id.* at 6-7 ¶ 18.

[29] *Id.* at 7 ¶ 19.

[30] *Id.* at 7-10.

Brazil.[31]  TKM contends that it has priority to the *res* over Stemcor, Daewoo, and all plaintiffs who have intervened in this action.

### 4.   ABN AMRO

Intervening plaintiff ABN AMRO is a financial institution organized under the laws of the Netherlands.  It entered into a lending relationship with AMT, under which it eventually agreed to lend AMT a sum of $30,000,000.[32] This loan was secured by COSIPAR's pledge of inventory, which included 45,000 metric tons of pig iron stored in locations throughout Brazil.[33]  AMT defaulted under the loan agreement by transferring collateral without ABN AMRO's consent.[34]  ABN AMRO accelerated amounts due and demanded that AMT and COSIPAR pay the principal amount of $30,000,143.28, plus interest, but defendants have failed to respond.[35]

According to ABN AMRO, the pig iron cargo aboard the M/V CLIPPER KASASHIO is part of the pledged property and remains subject to ABN

---

[31] *Id.* at 9 ¶ 28.

[32] R. Doc. 36-1 at 3 ¶ 11.

[33] *Id.* at 4 ¶ 14.

[34] *Id.* at 4 ¶ 18.

[35] *Id.* at 4 ¶ 18.

AMRO's security interest.[36]  ABN AMRO alleges that its own pledges predate any pledges in favor of TKM, which renders TKM's pledges invalid and grants ABN AMRO priority to the *res*.

### C.    Procedural History

On December 14, 2012, Stemcor and Daewoo each filed a federal lawsuit in the Eastern District of Louisiana.[37]  Pursuant to Rule B and the Federal Arbitration Act, both plaintiffs sought to attach the pig iron cargo belonging to defendants aboard the M/V CLIPPER KASASHIO as security for future arbitration awards.  Judge Ginger Berrigan issued an order directing the Clerk of Court to issue the writ of attachment requested by Stemcor.  Judge Eldon Fallon issued a similar order approving Daewoo's requested writ of attachment.  Both orders were signed on December 14, and these cases were consolidated in a single action before Judge Berrigan on December 27.[38]

At the time Stemcor and Daewoo filed suit, the M/V CLIPPER KASASHIO was entering the Gulf of Mexico en route to discharge its pig iron cargo in Louisiana.  On December 16, the vessel anchored at the Southwest Pass Fairway Anchorage, where it remained for over a week.  On December 21,

---

[36] *Id.* at 5 ¶ 21.

[37] R. Doc. 1; EDLA Civil Action No. 12-2968, R. Doc. 1.

[38] R. Doc. 24.

Clipper intervened in Daewoo's suit, Civil Action No. 12-2966, seeking a warrant of arrest and a writ of foreign attachment over the full 21,980 metric tons of pig iron aboard the M/V CLIPPER KASASHIO to secure its claims for unpaid freight, deadfreight, and demurrage.[39]

Before any writs of attachment had been served, Daewoo amended its complaint to allege a second jurisdictional basis for its claims under 28 U.S.C. §1331. Daewoo alleged that its contracts with AMT are arbitration agreements falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards and its implementing legislation. Citing AMT's alleged breach of those agreements, Daewoo sought an order compelling AMT to submit to arbitration, as well as an attachment of AMT's pig iron cargo pending arbitral proceedings. Based on these allegations, Judge Fallon issued an order approving Daewoo's application for a writ of attachment under Louisiana's non-resident attachment statute on December 21.[40]

On December 22, the U.S. Marshals Service served Stemcor's Rule B maritime attachment and Daewoo's Rule B and state law attachments upon

---

[39] R. Docs. 16-19.

[40] *See* EDLA Civil Action No. 12-2968, R. Docs. 9, 11, 12.

the cargo aboard the M/V CLIPPER KASASHIO.  At the time, the vessel was anchored at the Kenner Bend Anchorage in Jefferson Parish.[41]

Clipper's writ of attachment and warrant of arrest were not served on December 22.  Because Clipper initially sought to arrest and attach the full amount of the cargo aboard the M/V CLIPPER KASASHIO, instead of just the 9,000 metric tons owned by defendants, Duferco SA moved to intervene as the owner of the other 12,980 metric tons aboard the vessel.  In late December, Duferco filed a number of pleadings opposing Clipper's attempt to arrest and attach its portion of the cargo.[42]

While the Clipper-Duferco dispute was pending before Judge Berrigan, TKM filed suit in the 24th JDC for Jefferson Parish on December 28.[43]  In its state suit, TKM sought a writ of attachment and sequestration over the pig iron cargo aboard the M/V CLIPPER KASASHIO.  The state court approved TKM's request for a writ of attachment.  TKM asserts, and no other party disputes, that the Jefferson Parish Sheriff served seizure papers issued by the 24th JDC

---

[41] R. Docs. 62, 63.

[42] R. Docs. 23, 25, 26, 28.

[43] R. Doc. 441-1 at 104-110.

on the cargo on December 29 at 7:52 a.m.[44]  At the time, the M/V CLIPPER KASASHIO was anchored in Jefferson Parish at Kenner Bend.

Judge Berrigan resolved the Clipper-Duferco dispute on December 28. On that date, Judge Berrigan issued an order granting Clipper's motion to issue a writ attaching the 9,000 metric tons of pig iron owned by defendants, as well as a second order granting Clipper's motion for a warrant of arrest over the full 21,980 metric tons of cargo aboard the M/V CLIPPER KASASHIO.[45] The U.S. Marshals Service served the Clipper attachment writ and arrest warrant on December 29 at 8:00 a.m., eight minutes after the Jefferson Parish Sheriff served TKM's state court seizure papers on the cargo.[46]  Later that day, Clipper released its seizure of Duferco's 12,980 metric tons of pig iron.  As authorized by Judge Berrigan's order, the M/V CLIPPER KASASHIO left Kenner Bend to discharge Duferco's cargo at a facility located in St. John the Baptist Parish and returned to an anchorage point in St. Charles Parish.[47]

---

[44] R. Docs. 62, 63; *see also* R. Doc. 441-1 at 111-121.

[45] R. Docs. 43, 44.

[46] R. Doc. 70.

[47] R. Doc. 45.

ABN AMRO moved to intervene in Stemcor's suit, Civil Action No. 12-2966, on December 28, asserting supplemental jurisdiction over its claims.[48] ABN AMRO alleged that it had a senior lien on the pig iron cargo and requested a writ of attachment and sequestration under Louisiana law.[49] Judge Berrigan granted ABN AMRO's motion to intervene and ordered issuance of ABN AMRO's state law writ of attachment.[50]  The U.S. Marshals Service served ABN AMRO's writ on January 3, 2013.[51]  On January 7, TKM moved to intervene in these proceedings and sought issuance of a Louisiana state law writ of attachment and sequestration.[52]  Like ABN AMRO, TKM alleged that the cargo was subject to a security interest in its favor.  Judge Berrigan granted TKM's motions, and the U.S. Marshals Service served TKM's federal writs of attachment on January 11.[53]

On January 15, Stemcor amended its pleadings to assert diversity jurisdiction under 28 U.S.C. § 1332 as an additional basis for federal subject

---

[48] R. Doc. 36.

[49] R. Doc. 39.

[50] R. Docs. 54, 59.

[51] R. Doc. 95.

[52] R. Docs. 64, 66.

[53] R. Docs. 68, 72, 96.

14

matter jurisdiction.[54] Stemcor also sought issuance of a writ of attachment and sequestration under Louisiana law.   Judge Berrigan approved Stemcor's request for a state law attachment, and the U.S. Marshals Service served the writ on January 18.[55]

On January 11, all plaintiffs and intervening plaintiffs who had appeared in this action filed a joint motion for the interlocutory sale of the defendant's pig iron cargo to Duferco.[56]   Judge Berrigan granted the parties' motion, and the 9,000 metric tons of pig iron were sold on January 29.[57]   In accordance with the parties' agreement, the proceeds were deposited in the registry of court for the Eastern District of Louisiana, where they have remained since the date of the sale.[58]   The order expressly memorialized the parties' agreement that all parties retained the right to challenge the Court's subject matter jurisdiction over claims asserted by the plaintiffs and intervening plaintiffs.[59] It further provided, pursuant to the parties' agreement, that "in the event is

---

[54] R. Doc. 83.

[55] R. Docs. 92, 107.

[56] R. Docs. 75, 80

[57] R. Docs. 85, 104.

[58] R. Doc. 108.

[59] R. Doc. 104 at 7 ¶ 12.

should be ultimately determined that this Court lacks subject matter jurisdiction . . . and that jurisdiction is proper in another court, the Clerk shall transfer the Deposited Funds to the registry of the court having proper jurisdiction subject to the claims preserved herein."[60]

On April 24, 2013, TKM filed a "Motion to Vacate Maritime Attachments and to Dismiss Claims for Lack of Jurisdiction," arguing that the Stemcor and Daewoo claims did not support admiralty jurisdiction and that all remaining claims should be dismissed because the 24th JDC was the first court to validly exercise jurisdiction over the pig iron cargo.[61]   Judge Berrigan denied the motion without prejudice, reasoning that because defendants had yet to appear in the action "[p]rudence dictates against addressing the concerns of [TKM] at this time."[62]   The Court explained that it would rely on the federal *in rem* jurisdiction created by Clipper's December 29 Rule C arrest and exercise supplemental jurisdiction over the other claims to the *res*.[63]

On May 13, 2015, TKM attempted to file a second motion to vacate federal attachments for lack of jurisdiction.  Due to the length of its brief, TKM

---

[60] *Id.*

[61] R. Doc. 141.

[62] R. Doc. 195 at 3.

[63] *Id.*

sought leave to file a brief exceeding the designated page limit.[64]   Judge

Berrigan denied TKM's request to file its motion and precluded all parties

from filing dispositive motions until the parties reached certain stipulations.[65]

Following an October 15, 2015 settlement conference, Clipper settled its

claims against AMT for $421,000.   Those funds have since been paid to

Clipper from the proceeds of the court-ordered pig iron sale, and Clipper has

dismissed all claims *in rem* and *quasi rem* against the pig iron with prejudice.

On January 5, 2016, this case was reassigned from Judge Berrigan to

Section R of this Court for all further proceedings.   Following the

reassignment, TKM filed the instant "Motion to Vacate Attachments for Lack

of Jurisdiction and to Transfer the Pig Iron Sale Proceeds to the Jefferson

Parish 24th District Court."[66]   The motion is opposed by Stemcor, Daewoo,

ABN AMRO, and a fourth party, Sindicato dos Trabalhadores das Industrias

Metalurgicas do Municipio de Maraba ("SIMETAL"), whose claims have since

been dismissed from this suit with prejudice.[67]   As in its earlier motion, TKM

asserts that the initial federal attachments in this action were void for lack of

---

[64] R. Doc. 365.

[65] R. Doc. 380.

[66] R. Doc. 436.

[67] R. Docs. 442, 443, 444, 445.

subject matter jurisdiction and that the first court to validly attach the pig iron cargo was the 24th JDC for Jefferson Parish. Stemcor, Daewoo, ABN AMRO, and SIMETAL offer a number of arguments in support of federal jurisdiction. Stemcor also argues that even if the 24th JDC had been the first to validly attach the pig iron on December 29, 2012, that attachment dissolved when the pig iron left Jefferson Parish on December 30 and was subsequently sold, with the proceeds being deposited in the registry of this court.

## II.   LEGAL STANDARD

This case involves a number of federal court and state court attachments of 9,000 metric tons of pig iron aboard the M/V CLIPPER KASASHIO. Because multiple courts have asserted *in rem* and *quasi in rem* jurisdiction over the pig iron, the case involves the doctrine of "prior exclusive jurisdiction." That doctrine provides that "when one court exercises *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*. *Marshall v. Marshall*, 547 U.S. 293, 311 (2006). The doctrine of prior exclusive jurisdiction is not discretionary; it is a mandatory limitation on a court's jurisdiction. *Penn Gen. Cas. Co. v. Commonwealth of Pennsylvania ex rel. Schnader*, 294 U.S. 189, 195 (1935) ("[I]f the two suits are *in rem* or *quasi in rem*, requiring that the court or its officer have possession

or control of the property which is the subject of the suit in order to proceed with the cause and to grant the relief sought, *the jurisdiction of one court must of necessity yield* to that of the other." (emphasis added)); *State Eng'r of State of Nevada v. S. Fork Band of Te-Moak Tribe of W. Shoshone Indians of Nevada*, 339 F.3d 804, 810 (9th Cir. 2003) (describing the doctrine as a "mandatory jurisdictional limitation"); *United States v. One Hundred Thirty-Four Thousand Nine Hundred Twenty Dollars ($134,920.00) in U.S. Currency*, 25 F.3d 1051 (6th Cir. 1994) ("The first court to exercise *in rem* jurisdiction over a particular *res* does so to the exclusion of other courts.").

## III.   DISCUSSION

The United States District Court for the Eastern District of Louisiana was the first court to attempt jurisdiction over the pig iron at issue in this case. Daewoo and Stemcor each filed suit in this court on December 14, 2012, seeking to attach defendant AMT's pig iron as security for future arbitration proceedings.   Judge Fallon approved Daewoo's application for a Rule B maritime attachment and an attachment under Louisiana law, and Judge Berrigan approved Stemcor's Rule B attachment request.   The U.S. Marshal Services served each of these writs of attachment on December 22, and seven

days passed before the Jefferson Parish Sheriff served seizure papers issued by the 24th JDC for Jefferson Parish on behalf of TKM.

TKM argues, however, that the federal attachments served on December 22 were void for lack of subject matter jurisdiction. According to TKM, the breach of contract claims asserted by Stemcor and Daewoo do not support the admiralty jurisdiction necessary for a Rule B attachment, and Daewoo's state law attachment was issued without federal jurisdiction and in violation of Louisiana law. Thus, TKM contends that the first *valid* exercise of jurisdiction came from the 24th JDC. Invoking the doctrine of prior exclusive jurisdiction, TKM argues that the Jefferson Parish Sheriff's service of seizure papers removed the pig iron cargo from the jurisdiction of the Eastern District of Louisiana. Thus, TKM concludes, all writs of attachment and warrants of arrest issued in federal court after December 29, 2012 at 7:52 a.m. were taken without jurisdiction and must be vacated.

To evaluate TKM's motion, the Court considers the legal foundation for the December 22 attachments obtained by Stemcor and Daewoo, beginning with both parties' maritime attachments under Rule B.

### A.    Maritime Attachment

Daewoo and Stemcor allege that their contracts with AMT are maritime in nature and give rise to a maritime claim capable of supporting a Rule B

20

maritime attachment.  TKM moves to vacate the Rule B attachments on the grounds that the contracts are non-maritime agreements for the purchase and sale of a commodity, pig iron.  In opposition, Daewoo and Stemcor argue that under the standards set forth by the United States Supreme Court in *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14 (2004), the Court has admiralty jurisdiction. In support, Daewoo and Stemcor contend that the maritime transportation of pig iron is integral to their contracts.  Stemcor also appears to argue that admiralty jurisdiction exists under the "mixed contracts" doctrine, notwithstanding the *Kirby* decision.  Because the Court lacks admiralty jurisdiction under either approach, the Court grants TKM's motion to vacate the Rule B attachments obtained by Daewoo and Stemcor and served by the U.S. Marshals Service on December 22, 2012.

A Rule B attachment is a remedy available only under a court's admiralty jurisdiction.  *Alphamate Commodity GMBH v. CHS Europe SA*, 627 F.3d 183, 186 (5th Cir. 2010) (citing Fed. R. Civ. P. 9(h); Fed. R. Civ. P. Supp. R. A(1)(A)).  As such, a plaintiff may seek attachment under Rule B only if the claim forming the basis for its suit gives rise to admiralty jurisdiction under 28 U.S.C. § 1333.  *Id.*  "If the underlying dispute or claim does not fall within admiralty jurisdiction, the court lacks the authority to issue a Rule B attachment."  *Id.*; *see also Maritima Petroleo E Engenharia LTDA v. Ocean*

21

*Rig 1 AS*, 78 F. Supp. 2d 162, 166 (S.D.N.Y. 1999) ("The absence of maritime jurisdiction would prove fatal to plaintiff's attachment.").

A breach of contract claim is an admiralty claim if it involves a maritime contract. *See Gulf Coast Shell & Aggregate LP v. Newlin*, 623 F.3d 235, 240 (5th Cir. 2010). "A maritime contract is one 'relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment.'" *Id.* (quoting *J.A.R., Inc. v. M/V Lady Lucille*, 963 F.2d 96, 98 (5th Cir. 1992)). In determining whether a contract is maritime, courts to look to "the nature and character of the contract" to determine whether it has "reference to maritime service or maritime transactions." *Kirby*, 543 U.S. at 24; *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1213–14 (5th Cir.1986) (explaining that a contract is maritime if there is "a direct and proximate juridic[al] link between the contract and the operation of the ship, its navigation or its management afloat").

Importantly, "[a]dmiralty jurisdiction does not arise simply because a contract refers to a ship, or to the transportation of goods by ship." *Indagro S.A. v. Bauche S.A.*, 652 F. Supp. 2d 482, 489 (S.D.N.Y. 2009); *see Richard Bertram & Co. v. Yacht Wanda*, 447 F.2d 966, 967 (5th Cir. 1971) ("The mere fact that a ship is involved will not bring the cause within the jurisdiction of the admiralty court."). Instead, as the Fifth Circuit has explained,

22

> [i]n order to be considered maritime, there must be a *direct and substantial link* between the contract and the operation of the ship, *its navigation, or its management afloat*, taking into account the needs of the shipping industry, for the very basis of the constitutional grant of admiralty jurisdiction was to ensure a national uniformity of approach to world shipping.

*Alphamate*, 627 F.3d at 187 (quoting 1 Benedict on Admiralty § 182 (2010)) (emphasis in original).

The contracts at issue in this case are not maritime because their primary objective is the sale of pig iron. Neither pig iron nor its sale relates directly and substantially to the operation of a vessel or its navigation. While the contracts require AMT to arrange ocean transport of the pig iron, and to charter a vessel that meets certain specifications, these responsibilities are incidental to the pig iron sale itself. It is well established that a contract to sell a commodity is not maritime, "even if [it] requires maritime transport relating to the shipment of the commodity." *EFKO Food Ingredients Ltd. v. Pac. Inter-Link SDN BHD*, 582 F. Supp. 2d 466, 470 (S.D.N.Y. 2008) (rejecting argument that a contract to sell palm olein was maritime because it required the defendant "to charter ships to pack up and deliver the palm olein"); *see Lucky-Goldstar, Int'l(Am.) Inc. v. Phibro Energy Int'l, Ltd.*, 958 F.2d 58, 59 (5th Cir. 1992) ("[A] sale of goods by itself would not be 'maritime' merely because the seller agrees to ship the goods by sea to the buyer."); *Indagro*, 652

F. Supp. 2d at 491 (concluding that a fertilizer sale contract was non-maritime despite containing "a number of terms concerning the ocean transport of the fertilizer"); *Aston Agro-Indus. AG v. Star Grain Ltd.*, No. 06 CV 2805 (GBD), 2006 WL 3755156, at *3 (S.D.N.Y. Dec. 20, 2006) ("That the wheat was transported on a ship does not make the contracts maritime contracts any more than it would make them aviation contracts had the wheat been shipped via airplane."); *Shanghai Sinom Imp. & Exp. v. Exfin (India) Mineral Ore Co., Pvt.*, No. 06 CIV. 4711, 2006 WL 4029953 (S.D.N.Y. Oct. 5, 2006) (rejecting argument that a contract to sell ore was maritime because it "includes maritime provisions requiring the ore implicitly to be shipped by sea and specifying certain requirements regarding the conditions for such shipment").

The Supreme Court's decision in *Kirby* does not change this result. There, a freight forwarding company issued a through bill of lading, agreeing to deliver cargo from Australia to an inland destination in Alabama. *Kirby*, 543 U.S. at 18-19. Although the contract provided that the final leg of the cargo's journey would be by land, the Supreme Court held that this did not alter the essentially maritime nature of the parties' agreement. It reasoned that "[s]o long as the bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce--and thus it is a maritime contract." *Id.* at 27.

24

Although Daewoo and Stemcor attempt an analogy to *Kirby*, the contracts at issue in this case are not through bills of lading. AMT's agreement to sell pig iron to Daewoo and Stemcor did not obligate AMT to serve as an ocean carrier by transporting the commodity itself; nor did it create contractual rights or duties pertaining to the operation, management, or navigation of a vessel at sea. *Cf. id.* at 18-19 (explaining that "[a] bill of lading records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage"). Instead, the contracts provided that AMT, as the pig iron seller, would enter charter parties with a separate entity, which would in turn ship the pig iron to the buyers.[68] Like the bills of lading in *Kirby*, the charter parties between AMT and the shippers are maritime contracts. The contracts for the sale of pig iron are not. *See Armour & Co. v. Ft. Morgan S.S. Co.*, 270 U.S. 253, 259 (1926) (distinguishing between a charter party associated with a cattle shipment, which was maritime, and contracts "to purchase, assemble, and sell the cattle" and "to charter vessels and therein transport the cattle," which were non-maritime).

---

[68] *See* R. Doc. 441-1 at 5 (AMT-Stemcor contract, providing: "[t]he seller to charter a single deck bulk carrier" meeting certain specifications); *Id.* at 30-31 (AMT-Daewoo contract, providing that a second provisional payment for the pig iron would be made after the pig iron was loaded aboard a chartered vessel).

25

Nor does admiralty jurisdiction arise under the so-called "mixed contracts" doctrine. In most breach of contract actions, the underlying contract must be "wholly maritime" to support admiralty jurisdiction. *Lucky-Goldstar*, 958 F.2d at 59; *see Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 555 (2d Cir. 2000) ("The general rule for exercising admiralty jurisdiction in a contract case is that jurisdiction arises only when the subject-matter of the contract is 'purely' or 'wholly' maritime in nature."). Thus, contracts that are "mixed"--that is, they contain both maritime and non-maritime obligations--generally cannot give rise to admiralty jurisdiction. *See Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1231-32 (5th Cir. 1985). The Fifth Circuit recognizes two exceptions to this default rule. Federal courts may exercise admiralty jurisdiction over a mixed contract if: (1) the land-based portion of the contract is incidental to the sea-based portion; or (2) the "contract's maritime obligations are separable from its non-maritime aspects and can be tried separately without prejudice to the other." *Alphamate*, 627 F.3d at 187 (quoting *Lucky-Goldstar*, 958 F.2d at 59).

In a portion of its brief, Stemcor argues that the mixed contracts doctrine was "substantially eroded, if not eliminated" by the Supreme Court's decision in *Kirby* and faults the Fifth Circuit for applying the doctrine post-*Kirby* in

*Alphamate*, 627 F.3d at 187.[69]  Somewhat inconsistently, Stemcor also argues that the mixed contract doctrine's second exception applies to this case and establishes admiralty jurisdiction over its breach of contract claims.[70]   In support, Stemcor argues that AMT's contractual duty to arrange ocean transport of the pig iron was a severable maritime obligation, which AMT breached by failing to deliver pig iron under the terms of the contract.

Stemcor does not plausibly allege that AMT breached a maritime obligation, let alone a maritime obligation that is severable from the non-maritime core of the pig iron sale contracts.   Stemcor's first amended complaint alleges that AMT failed to deliver the total quantity of pig iron specified in the parties' agreements.[71]  It further alleges that some of the pig iron it did send was "off-spec and/or damaged."[72]  These allegations relate to quantity and quality terms of the pig iron sale contracts, which create non-maritime obligations with no connection to the management or navigation of a vessel at sea.  *See Exim Grain Trade, B.V. v. J.K. Int'l Pty Ltd.*, No. 08 CIV.

---

[69] R. Doc. 442 at 7-8.

[70] *Id.* at 8.

[71] R. Doc. 83 at 3 ¶ 11 (alleging that defendants made "certain partial shipments under Contract No. NR10780"); *id.* at 4 ¶ 17 (alleging that defendants "made one partial shipment under Contract No. NR 1685").

[72] *Id.* at 83 ¶ 24.

6989 (WHP), 2008 WL 5191058, at *2 (S.D.N.Y. Dec. 2, 2008) ("While JKI failed to transport the total tonnage under the Wheat Contract and failed to take timely delivery because it could not find a suitable vessel, the amount of wheat and time of delivery are not maritime obligations.").  A contrary ruling would distort the nature of the parties' contracts and unjustifiably extend the reach of admiralty jurisdiction.  *See Alphamate*, 627 F.3d at 187 (noting the impropriety of "expand[ing] maritime jurisdiction to include nearly every contract involving the sale of good transported by ship").

In sum, the contracts underlying Daewoo's and Stemcor's breach of contract claims are not maritime contracts, either in whole or severable part. Accordingly, neither Daewoo nor Stemcor may pursue its claims under the this Court's admiralty jurisdiction, and there is no jurisdictional basis for the December 22, 2012 Rule B attachments.  *See Aston Agro-Indus.*, 2006 WL 3755156, at *2 ("Absent the requisite admiralty or maritime jurisdiction, a Rule B maritime attachment is void.").  The Court therefore grants TKM's motion to vacate those attachments for lack of jurisdiction.

### B.    Louisiana Law Attachment Pursuant to the Convention

Other than the invalid Rule B attachments, the only other exercise of federal jurisdiction over the *res* that predates the 24th JDC for Jefferson Parish's intervention is Daewoo's December 22 attachment under the

Louisiana non-resident attachment statute, Louisiana Code of Civil Procedure article 3541(5).   Daewoo alleges that the jurisdictional basis for this attachment is federal question jurisdiction, which exists by way of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") and its implementing legislation.   In support, Daewoo contends that arbitration provisions in its contracts with AMT render those contracts arbitration agreements subject to the Convention's terms.   It further alleges that because AMT breached those contracts, Daewoo is entitled to an order compelling AMT to arbitrate and a state law attachment of AMT's property to be held as security pending arbitration.

TKM moves to vacate the state law attachment, offering several arguments to support its position.   First, TKM argues that Daewoo may not bring suit under the Convention because its complaint does not alleged that it has been "aggrieved" by AMT's refusal to arbitrate, as the Convention allegedly requires.   Second and relatedly, TKM contends that because Daewoo has not alleged that AMT refuses to arbitrate, its suit to compel arbitration does not present a justiciable case or controversy under Article III.   Third, TKM argues that because the Convention does not affirmatively authorize attachment remedies, the Court lacks jurisdiction to entertain Daewoo's request for such relief.   Fourth, TKM contends that Daewoo's attachment

under Louisiana's non-resident attachment statute cannot stand because that statute does not permit attachment in aid of arbitration.

To facilitate its analysis, the Court briefly outlines the framework of the Convention and its implementing legislation before addressing TKM's specific jurisdictional arguments.

### 1.    Framework of the Convention

The Convention is a multilateral treaty requiring signatory nations to give effect to private arbitration agreements and to recognize arbitration awards given in other nations.[73]  The United States has ratified the Convention and implemented it through Chapter Two of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201-208.  As the Fifth Circuit has observed, "Congress's purpose and intent, in enacting [Chapter Two], was 'to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.'"  *Acosta v. Master Maint. & Const. Inc.*, 452 F.3d 373, 376 (5th Cir. 2006) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n. 15 (1974)).

---

[73] Article II(1) of the Convention provides that "[e]ach Contracting State shall recognize an agreement in writing under which the parties submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration."

Chapter Two promotes an "unambiguous policy" favoring arbitration of commercial disputes, particularly in the international context. *Id.*; *see also Sunkyong Eng'g & Const. Co., LTD. v. Born, Inc.*, 149 F.3d 1174 (5th Cir. 1998) (noting the "liberal" policy favoring arbitration).

Although Congressional policy favors alternative dispute resolution, Chapter Two does not completely displace federal courts from the arbitration process. Chapter Two contains a jurisdictional provision which provides federal subject matter jurisdiction over any "action or proceeding" that falls within the Convention's ambit. 9 U.S.C. § 203. Specifically, section 203 provides: "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy." *Id.*; *see also* 9 U.S.C. § 202 (defining arrangements that "fall under the Convention" as arbitration agreements or arbitral awards arising out of a commercial legal relationship). Chapter Two also contains two remedy provisions, which expressly authorize district courts with jurisdiction under the Convention to: (1) compel the parties to arbitrate pursuant to their agreement, (2) appoint arbitrators, and (3) confirm arbitration awards. *See* 9 U.S.C. §§ 206, 207.

Courts do not apply Chapter Two in a vacuum.  Section 208 provides that Chapter One of the FAA, which governs domestic arbitration agreements and awards, "applies to actions and proceedings brought under [Chapter Two] to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States."  9 U.S.C. § 208; *see E.A.S.T., Inc. of Stamford, Conn. v. M/V Alaia*, 876 F.2d 1168, 1173 (5th Cir. 1989) (applying Chapter One' provision authorizing vessel seizures in admiralty arbitrations to an action under the Convention).

### 2.    The Convention Provides Federal Subject Matter Jurisdiction Over Daewoo's Suit

Contrary to TKM's assertion, the Convention and its implementing legislation vest the Court with jurisdiction over Daewoo's suit against AMT. As noted, Chapter Two of the FAA provides federal subject matter jurisdiction over any "action or proceeding *falling under* the Convention . . . ."  9 U.S.C. § 203 (emphasis added).  The Fifth Circuit has identified four requirements that must be met for a district court to establish jurisdiction under the Convention: "(1) there is a written agreement to arbitrate the matter; (2) the agreement provides for arbitration in a Convention signatory nation; (3) the agreement arises out of a commercial legal relationship; and (4) a party to the agreement is not an American citizen." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379

F.3d 327, 339 (5th Cir. 2004); *see also Sunkyong Eng'g & Const. Co., LTD. v. Born, Inc.*, 149 F.3d 1174 (5th Cir. 1998) (holding that if these requirements are met, the Convention requires the court to compel arbitration).

The pig iron sale contracts between Daewoo and AMT are arbitration agreements falling under the Convention. Each contract is in writing, and each pertains to a commercial legal relationship between foreign entities. Further, each contract contains an arbitration provision, which requires Daewoo and AMT to submit "any controversy or claim arising out of or relating to the Agreement" to arbitration administered by the American Arbitration Association in New York.[74] Finally, these provisions provide for arbitration in the United States, which is a signatory to the Convention. Accordingly, the Convention embraces the pig iron sale contracts, and 9 U.S.C. § 203 vests this Court with federal question jurisdiction over Daewoo's suit to compel arbitration and secure pre-arbitration attachment of AMT's property.

Daewoo's failure to allege that it has been "aggrieved" by AMT's refusal to arbitrate does not change this result. To support its argument that a party must be "aggrieved" to maintain suit under the Convention, TKM cites 9 U.S.C. § 4. That provision, which appears in Chapter One of the FAA,

---

[74] R. Doc. 441-1 at 32, ¶ 10.

provides: "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  Courts have interpreted section four's grievance reference to mean that "the right to petition for arbitration under § 4 only arises after the adverse party has refused arbitration."  *PaineWebber Inc. v. Faragalli*, 61 F.3d 1063, 1067 (3d Cir. 1995) (collecting cases).

Even assuming section four applies to cases to compel arbitration pursuant to the Convention,[75] TKM's reliance on this provision is misplaced. Although Daewoo's complaint requests an order compelling arbitration, the gravamen of Daewoo's suit--and the subject of TKM's motion to vacate--is its attempt to attach AMT's assets and hold them as security pending arbitration.

---

[75] As noted, 9 U.S.C. § 208 provides that the provisions of Chapter One apply to Chapter Two cases only "to the extent that chapter is not in conflict with this chapter or the Convention. . . ."  In the context of suits to compel arbitration, section 204's requirement that a party be "aggrieved" appears to conflict with Chapter Two, which does not require a party to obtain any particularly status before filing suit in federal court.  *See* 9 U.S.C. § 206 (providing that in suits falling under the Convention "[a] court . . . may direct that arbitration be held in accordance with the agreement at any place therein provided for. . . .").  At least one court has reached this conclusion, holding that the "aggrieved party" requirement is inapplicable to suits to compel arbitration under the Convention.  *See Daye Nonferrouse Metals Co. v. Trafigura Beheer B.V.*, No. 96 CIV. 9740 (RWS), 1997 WL 375680, at *9 (S.D.N.Y. 1997).  Another court taken the opposite position.  *See Hartford Acc. & Indem. Co. v. Equitas Reinsurance Ltd.*, 200 F. Supp. 2d 102, 108-09 (D. Conn. 2002).

If the Convention and its implementing legislation permit Daewoo to seek provisional remedies in aid of arbitration, then Daewoo's suit for a pre-arbitration attachment is an "action or proceeding" under the Convention, and federal jurisdiction exists. *See* 9 U.S.C. § 203 (providing federal jurisdiction over any "action or proceeding falling under the Convention"); *see also Venconsul N.V. v. TIM Int'l N.V.*, No. 03–CV–5387, 2003 WL 21804833, at *3 (S.D.N.Y. 2003) (holding that courts have "power to entertain requests for provisional remedies in aid of arbitration even where the request for remedies does not accompany a motion to compel arbitration or to confirm an award"). The Court must therefore determine whether the Convention permits suits to obtain provisional remedies.

### 3.    Provisional Remedies in Aid of Arbitration

Federal Rule of Civil Procedure 64(a) provides:

> At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment.  But a federal statute governs to the extent it applies.

Fed. R. Civ. P. 64(a).  Subsection (b) further provides that the remedies available under Rule 64 include, among other things, attachment and other "equivalent remedies."  Fed. R. Civ. P. 64(b).  Thus, in most suits brought in federal court, a party may request provisional remedies available under state

law, and courts may grant those remedies, subject to any federal statute or constitutional limitations.  *See* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2931 (3d ed.).

Courts are divided, however, on whether the Convention and Chapter Two of the FAA limit courts' authority to issue provisional remedies in aid of arbitral disputes.  The leading case holding that the Convention forbids provisional remedies, such as a prejudgment attachment, is *McCreary Tire & Rubber Co. v. CEAT S.p.A.*, 501 F.2d 1032 (3d Cir. 1974).  There, a plaintiff sued an Italian company in state court for breach of contract and obtained an attachment.  *Id.* at 1033.  The Italian company removed the case and, citing the contract's arbitration provision, moved the district court to vacate the attachment.  *Id.*  The district court denied the motion, and the Third Circuit reversed.  The court reasoned that the plaintiff's attempt to provisionally attach the Italian company's property under state law violated the parties' agreement to submit all disputes to arbitration.  *Id.* at 1038.  Because the Convention "forbids the courts of a contracting state from entertaining a suit which violates an agreement to arbitrate," this maneuver was barred by the Convention and its implementing legislation.  *Id.*

The Ninth Circuit has also held that federal courts may not provide provisional remedies in aid of arbitration, at least when the plaintiff's claims

36

are arbitrable and the designated arbitrators are authorized to grant interim relief. *See Simula, Inc. v. Autoliv*, Inc., 175 F.3d 716, 726 (9th Cir. 1999). Unlike the Third Circuit in *McCreary*, the Ninth Circuit did not base its holding on the text of the Convention. Rather, it emphasized the need for deference to the powers of the arbitral tribunal. *See id.* (reasoning that if the designated arbitrators have power to order interim measures, a court should refuse to grant provisional relief "[o]n [that] basis alone.").

Like the Third Circuit and the Ninth Circuit, the Second Circuit initially took a restrictive approach to provisional relief under the Convention. In *International Shipping Co. v. Hydra Offshore, Inc.*, 875 F.2d 388 (2d Cir. 1989), a case upon which TKM heavily relies, a foreign plaintiff sued a foreign defendant in New York, seeking an injunction preventing the defendant from disposing of property pending arbitration. *Id.* at 389-9o. On appeal, the Second Circuit noted with approval the district court's conclusion that the Convention deprived it of jurisdiction to grant a preliminary injunction, reasoning that the plaintiff "did not seek either to compel arbitration or to enforce an arbitral award." *Id.* at 391 n. 5.

More recently, the Second Circuit has expanded its view of jurisdiction under the Convention. In *Borden, Inc. v. Meiji Milk Products Co.*, 919 F.2d 822 (2d Cir. 1990), the court found jurisdiction to entertain a plaintiff's motion

for a preliminary injunction in connection with its suit to compel arbitration. *Id.* at 826.   The court reasoned that "entertaining an application for a preliminary injunction *in aid of arbitration* is consistent with the court's powers pursuant to [9 U.S.C.] § 206." *Id.* (emphasis added).   "The desire for speedy decisions in arbitration is entirely consistent with a desire to make as effective as possible recovery upon awards, after they have been made, which is what provisional remedies do." *Id.* (quoting *Murray Oil Products Co. v. Mitsui & Co.*, 146 F.2d 381, 384 (2d Cir. 1944)).   Thus, requests for interim relief adhere to the "provisions and . . . spirit" of the Convention.   As to the Third Circuit's contrary ruling, the court distinguished *McCreary* as involving a plaintiff who sought attachment as an alternative to arbitration, rather than in aid of it.   *See id.* ("In the instant case, far from trying to bypass arbitration, [plaintiff] sought to have the court *compel* arbitration.").

Following *Borden*, numerous courts have held that the Convention does not divest district courts of jurisdiction to grant preliminary injunctions, pre-arbitration attachments, and other provisional remedies in aid of arbitration. *See, e.g.*, *CRT Capital Grp. v. SLS Capital, S.A.*, 63 F. Supp. 3d 367, 373 (S.D.N.Y. 2014) (finding jurisdiction over proceeding to enjoin an arbitration; collecting cases); *Emirates Int'l Inv. Co., LLC v. ECP Mena Growth Fund, LLC*, No. 11 CIV. 9227 JGK, 2012 WL 2198436, at *5–6 (S.D.N.Y. June 15,

2012) (noting case law providing for federal jurisdiction to grant provisional remedies in aid of arbitration); *Bahrain Telecommunications Co. v. Discoverytel, Inc.*, 476 F. Supp. 2d 176, 182 (D. Conn. 2007) (finding that state law attachment is permissible through Rule 64 in cases involving pending arbitrations, including international arbitrations); *Vencosul*, 2003 WL 21804833, at *3 (interpreting *Borden* "as recognizing a court's power to entertain requests for provisional remedies in aid of arbitration"); *China Nat. Metal Products Imp./Exp. Co. v. Apex Digital, Inc.*, 155 F. Supp. 2d 1174, 1180 (C.D. Cal. 2001) (holding that the Convention does not deprive the court of jurisdiction to order attachment pending arbitration). Like the Second Circuit in *Borden*, these courts reason that provisional remedies are consistent with the Convention because they protect the integrity of the arbitral process and "ensure that an arbitration panel can afford meaningful relief." *Gerling Global Reinsurance Corp. v. Sompo Japan Ins. Co.*, 348 F.Supp.2d 102, 105 (S.D.N.Y. 2004); *see China Nat. Metal Products*, 155 F. Supp. 2d at 1180 (reasoning that "provisional remedies such as attachment reinforce arbitration agreements by ensuring that assets from which an arbitration award would be satisfied are secured while arbitration is pending").

Although the Fifth Circuit has not ruled on whether the Convention proscribes attachment in non-admiralty arbitrations, it has expressed

skepticism of the Third Circuit's *McCreary* decision and sympathy for a broader view of a federal jurisdiction.   In *E.A.S.T., Inc. of Stamford, Connecticut v. M/V Alaia*, 876 F.2d 1168 (5th Cir. 1989), the court held that the Convention does not prevent courts from employing maritime attachment procedures in connection with arbitrable claims that fall within admiralty jurisdiction. *Id.* at 1173.  Rather than distinguishing *McCreary* as involving a non-admiralty dispute, the court challenged the ruling directly, noting that "*McCreary* has been criticized expressly by a number of courts and commentators--particularly in the admiralty context." *Id.*  The court also noted that attachment may serve as an important "security device in aid of arbitration" and suggested that a prejudgment attachment by a party seeking to compel arbitration would not conflict with the Convention's goals. *Id.*

Although *E.A.S.T.* does not address the precise issue before the Court, the Fifth Circuit's reasoning is instructive.   Like the plaintiff in *E.A.S.T.*, Daewoo initiated this suit to force its opponent to arbitrate a breach of contract claim.[76]  Far from attempting to circumvent arbitration, Daewoo sought to attach AMT's property as a means of facilitating the arbitration process and increasing its chance of recovering on a possible award.   These

---

[76] R. Doc. 8 at 14 (Daewoo's prayer for relief, asking "that arbitration be compelled" pursuant to the Daewoo-AMT agreements).

facts distinguish *McCreary* and reduce whatever persuasive authority that case retains in light of the criticism identified by the Fifth Circuit. In addition, *E.A.S.T.* highlights the practical importance of provisional remedies in aid of arbitration proceedings. By permitting parties to seize property pending arbitration, attachment ensures that assets will be available to satisfy any award the arbitrators may provide. This, in turn, promotes the pro-arbitration goals of the Convention and its implementing legislation by ensuring that arbitration provides a forum for meaningful relief. *See Bahrain Telecommunications*, 476 F. Supp. 2d at 182 ("A prejudgment remedy does not interfere with the arbitral process but merely ensures that there will be assets available to satisfy any judgment the arbitrators themselves may render."); *Tennessee Imports, Inc. v. Filippi*, 745 F. Supp. 1314, 1329 (M.D. Tenn. 1990) (explaining that, in certain cases, provisional remedies may "necessary to protect the integrity of the applicable dispute resolution process"). The Court therefore finds no conflict between a request for pre-arbitration attachment and the "provisions and . . . spirit" of the Convention. *See Borden*, 919 F.2d at 826.

For these reasons, the Court rejects *McCreary* and *Simula* and adopts the Second Circuit's interpretation of jurisdiction under the Convention. Contrary to TKM's assertion, the Convention does not deprive this Court of

jurisdiction or Rule 64 authority to order provisional remedies available under state law in connection with arbitral disputes. The Court therefore turns to the merits of Daewoo's request for provisional relief under Louisiana's non-resident attachment statute.

### 4.    Non-Resident Attachment under Louisiana Law

That the Court has jurisdiction to entertain Daewoo's request for a provisional remedy does not mean that Daewoo meets the requirements for its issuance. As noted, Rule 64 permits district courts to borrow state remedies for the seizure of property to secure a potential judgment. Fed. R. Civ. Proc. 64(a). While the Federal Rules of Civil Procedure govern the conduct of an action in federal court, "state law determines when and how a provisional remedy is obtained." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2932 (3d ed.). Federal courts must therefore honor state laws and procedural rules limiting the manner and circumstances in which a court may grant provisional relief. *Id.*; *see also Nat'l Loan v. Fid. Bank*, 51 F.3d 1045 (5th Cir. 1995) (applying state rules governing garnishment proceedings); *Bahrain Telecommunications*, 476 F. Supp. 2d at 186–87 (applying state statutory limitations on issuance of provisional remedies in aid of arbitration).

42

Under Louisiana law, a party may obtain a writ of attachment in "any action for a money judgment, whether against a resident or a nonresident, regardless of the nature, character, or origin of the claim, whether it is for a certain or uncertain amount, and whether it is liquidated or unliquidated." La. Code Civ. Proc. art. 3542. The Louisiana Code of Civil Procedure provides a number of grounds for attachment, including, as relevant here, that the defendant "[i]s a nonresident who has no duly appointed agent for service of process within the state." La. Code Civ. Proc. art. 3541(5). There is no dispute that the defendant in this case, AMT, lacks an agent for service of process in Louisiana. At issue is whether Daewoo's suit to compel arbitration and obtain provisional relief is an "action for a money judgment" to which Louisiana's non-resident attachment statute applies.

According to Black's Law Dictionary, a "money judgment" is "a judgment for damages *subject to immediate execution*, as distinguished from equitable or injunctive relief." Black's Law Dictionary (10th ed. 2014) (emphasis added). Daewoo's complaint does not ask this court for an immediately executable damages award. It seeks a provisional attachment and an order compelling AMT to arbitrate Daewoo's contract claims in the parties designated tribunal. That Daewoo seeks a provisional attachment remedy does not itself render Daewoo's suit a "money judgment" action. Otherwise, attachments would be

43

self-justifying; through its issuance, every attachment would automatically satisfy article 3542, rendering that provision's limiting language superfluous and without legal effect.

Nor does Daewoo's request to compel arbitration bring its suit within the ambit of article 3542. In ruling on a petition to compel arbitration, a court does not rule on the merits of the underlying claims, much less award damages to the prevailing party. Instead, it conducts only a limited inquiry into whether there is a agreement to arbitrate the matter that falls under the Convention. *See Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 339 (5th Cir. 2004). In that sense, a petition to compel arbitration resembles a declaratory judgment action, which, according to Black's Law Dictionary, is the antithesis of an action for a "money judgment." *See Webb v. Investacorp, Inc.*, 89 F.3d 252, 260 (5th Cir. 1996) (affirming district court's summary dismissal of plaintiff's suit for a declaratory judgment that its dispute was not subject to arbitration because the court's earlier order granting the defendant's motion to compel arbitration "dispose[d] of the same issue" raised in plaintiff's complaint). Given the disconnect between the attachment statute's language and the nature of Daewoo's suit, it is telling that Daewoo fails to cite a single Louisiana case permitting a party to attach property under the non-resident attachment statute pending arbitration.

44

Nonetheless, Daewoo argues that a suit to compel arbitration under the FAA is, as a practical matter, indistinguishable from a suit seeking money damages from a domestic court. In support, Daewoo cites what it characterizes as "the inevitable confirmation of an arbitration award that follows a successful arbitration."[77] It is true that in an FAA suit, an order compelling the parties to arbitrate does not necessarily end the litigation. Upon a party's motion, courts may stay an arbitrable dispute pending the arbitrator's ruling. 9 U.S.C. § 3. This stay permits parties "to complete the arbitration and then return to the court with appropriate jurisdiction to either confirm or vacate the arbitrator's award." *In re Jamster Mktg. Litig.*, No. MDL 1751, 2009 WL 250089, at *2 (S.D. Cal. Feb. 2, 2009) (describing the "prototypical case" under the FAA).[78] But a party is not required to seek confirmation of an arbitral award in the court where it sought to compel arbitration. A party that prevails in arbitration may bring a confirmation suit in any court with jurisdiction under the Convention. 9 U.S.C. § 207. Further, although this suit has been pending for over three years, Daewoo has not

---

[77] R. Doc. 443 at 11.

[78] Although Chapter Two does not explicitly authorize staying litigation pending arbitration, Chapter One's stay provision is incorporated into Chapter Two through 9 U.S.C. § 208. *See DiMercurio v. Sphere Drake Ins., PLC*, 202 F.3d 71, 78 (1st Cir. 2000); *Energy Transp., Ltd. v. M.V. San Sebastian*, 348 F. Supp. 2d 186, 201 (S.D.N.Y. 2004).

asked the Court to stay proceedings pending arbitration or to confirm an arbitral award, which somewhat undermines its reliance on these "prototypical" FAA procedures in this case.

In any event, despite the arguable parallels between FAA litigation and more traditional suits, the Court does not read article 3542's reference to "money judgment" actions as a broad grant of authority permitting parties to an arbitration agreement to attach property in aid of arbitration. In addition to the absence of any case law supporting Daewoo's position, two considerations support this conclusion. First, Louisiana law requires strict adherence to the terms and limitations of statutory attachment procedures. Prejudgment attachment is "a drastic remedy by its very nature." *Lavergne v. de Lavergne*, 224 So. 2d 149, 153 (La. Ct. App. 4 Cir. 1969); *see also Merrill Lynch Futures Inc. v. Kelly*, 585 F. Supp. 1245, 1259 (S.D.N.Y. 1984) (describing attachment as "a harsh remedy not lightly to be granted"). Thus, as one Louisiana court has explained, attachment statutes are "strict[ly]" interpreted and subject to "rigid application." *de Lavergne*, 224 So. 2d at 153; *see also Future Tech Int'l, Inc. v. Tae Il Media, Ltd.*, 944 F. Supp. 1538, 1554 (S.D. Fla. 1996) ("[B]ecause of the extraordinary nature of attachment proceedings, the terms of the statute must be narrowly construed."). This principle counsels against expanding Louisiana's non-resident attachment

46

statute by permitting attachments in actions not expressly identified in article 3542's terms.

Second, Louisiana's arbitration statutes suggest that pre-arbitration attachments are not available under Louisiana law.   The "Louisiana Arbitration Law," La. Stat. § 9:4201, *et seq.*, governs the conduct of arbitrable disputes in state courts.  That statute contains a number of detailed provisions outlining the role of state courts and allocating responsibilities among judges and arbitral tribunals.  *See, e.g.*, La Stat. § 9:4204 (authorizing courts to appoint arbitrators pursuant to an arbitration agreement); *id.* at § 9:4206 (authorizing arbitrators to summon witnesses and permitting courts to enforce summonses  with orders of contempt); *id.* at § 9:4207 (permitting courts to order depositions in connection with arbitration).  Although some of these provisions are highly detailed, none authorizes or even contemplates attachment of property in connection with arbitration proceedings.   The statute's silence is significant because, as the Supreme Court of Louisiana has explained, "when the legislature specifically enumerates a series of things, the legislature's omission of other items, which could have easily  been included in the statute, is deemed  intentional."   *See Int'l Paper Co. v. Hilton*, 966 So. 2d 545, 558–59 (La. 2007).

This canon applies with particular force in this case.  In recent years, a number of states have enacted legislation based on the Model Law on International Commercial Arbitration prepared by the United Nations Commission on International Trade Law ("UNCITRAL").  Consistent with the UNCITRAL Model Law, these states expressly authorize courts to attach property pending arbitration proceedings.  *See* Cal. Civ. Proc. Code § 1297.93; Conn. Gen. Stat. Ann. § 52-422;  N.Y. C.P.L.R. § 7502(c); N.C. Gen. Stat. § 1-567.39(c)(1);  Ohio Rev. Code Ann. §§ 2712.14-2712.16; Or. Rev. Stat. § 36.470(3)(a); Tex. Civ. Prac. & Rem. Code § 172.175(c)(1).  Louisiana has neither adopted the UNCITRAL Model Law's interim relief provisions nor enacted anything resembling the legislative model.  That Louisiana has not joined other states in expressly authorizing pre-arbitration attachment suggests that the remedy is foreign to Louisiana law and policy.

For these reasons, the Court finds that Daewoo's suit to compel arbitration is not an "action for money judgment" for purposes of Louisiana's non-resident attachment provisions.  Accordingly, article 3542 precludes Daewoo from using state attachment procedures to seize AMT's property pending anticipated arbitration proceedings.  The Court therefore grants TKM's motion and vacates Daewoo's December 22, 2012 state law attachment.

### C.  Prior Exclusive Jurisdiction

Having found that the initial federal attachments in this case were legally invalid, the Court turns to the second half of TKM's motion.  Invoking the doctrine of prior exclusive jurisdiction, TKM argues that the Court must defer to TKM's suit in the 24th JDC for Jefferson Parish, vacate all federal attachments that post-date service of the state court's attachment papers on December 29 at 7:52 a.m.  It further argues that pursuant to the parties' joint agreement for an interlocutory sale of the pig iron, which is memorialized in Judge Berrigan's orders on January 16 and January 24, 2013, the Court must transfer the proceeds of the pig iron sale to the registry of the state court.

The prior exclusive jurisdiction provides that "when one court exercises *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*."  *Marshall v. Marshall*, 547 U.S. 293, 311 (2006).  The purpose of this rule is "[t]o avoid unseemly and disastrous conflicts in the administration of our dual judicial system, and to protect the judicial processes of the court first assuming jurisdiction."  *Penn Gen. Cas. Co. v. Commonwealth of Pennsylvania ex rel. Schnader*, 294 U.S. 189, 196 (1935).  Importantly, while it is rooted in principles of comity, the prior exclusive jurisdiction doctrine is not discretionary; it is a mandatory limitation on a court's jurisdiction.  *Id.* at 195 ("[I]f the two suits are *in rem* or *quasi in rem*, requiring that the court or its officer have possession or control of the property

49

which is the subject of the suit in order to proceed with the cause and to grant the relief sought, *the jurisdiction of one court must of necessity yield* to that of the other." (emphasis added)); *State Eng'r of State of Nevada v. S. Fork Band of Te-Moak Tribe of W. Shoshone Indians of Nevada*, 339 F.3d 804, 810 (9th Cir. 2003) (describing the doctrine as a "mandatory jurisdictional limitation"); *United States v. One Hundred Thirty-Four Thousand Nine Hundred Twenty Dollars ($134,920.00) in U.S. Currency*, 25 F.3d 1051 (6th Cir. 1994) ("The first court to exercise *in rem* jurisdiction over a particular *res* does so to the exclusion of other courts.").

Because the doctrine of prior exclusive jurisdiction establishes a principle of priority, timing is critical.  "Where the assertion of jurisdiction by the two courts is nearly simultaneous, it becomes important, as in the present case, to determine the precise time when the jurisdiction attaches." *Penn Gen. Cas. Co.*, 294 U.S. at 196.  As numerous courts have explained, the *sina qua non* of jurisdiction in an *in rem* or *quasi in rem* action is a lawful seizure and custody or control of the relevant property. *See Donovan v. City of Dallas*, 377 U.S. 408, 412 (1964) (holding that "the state or federal court having custody of such property has exclusive jurisdiction to proceed" in an *in rem* or *quasi in rem* case); *Freeman v. Howe*, 65 U.S. 450, 454 (1860) ("[T]o give jurisdiction to the District Court in a proceeding *in rem*, there must be a valid

50

seizure and an actual control of the *res* under the process."); *Scarabin v. Drug Enf't Admin.*, 966 F.2d 989, 993 (5th Cir. 1992) (stating that a court's *in rem* jurisdiction over a *res* attached at the moment of seizure and that a court must maintain physical control of the property); *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1435 (11th Cir. 1991) ("*In rem* jurisdiction derives entirely from the court's control over the defendant *res*.").

Turning to this case, application of these principles demonstrates that the 24th JDC for Jefferson Parish has acquired exclusive jurisdiction over the subject pig iron, leaving this Court powerless to proceed.  Both the state attachment proceedings initiated by TKM and the proceedings in this Court are *in rem* or *quasi in rem*.  Article 9 of the Louisiana Code of Civil Procedure provides that an attachment of a non-resident's property confers *quasi in rem* jurisdiction.  L a. Code Civ. Proc. art. 9.  Maritime attachments under Rule B attachments have the same effect, while Rule C arrests produce *in rem* jurisdiction.  *See Sembawang Shipyard, Ltd. v. Charger, Inc.*, 955 F.2d 983, 987 (5th Cir. 1992).  As explained above, the initial maritime and state law attachments in these consolidated cases, which the U.S. Marshals Service served on December 22, 2012, were issued without jurisdiction and in violation of Louisiana law.  As such, these attachments failed to establish federal jurisdiction over the *res*.  *See Freeman*, 65 U.S. at 454 ("[T]o give

jurisdiction to the District Court in a proceeding *in rem*, there must be a valid seizure and an actual control of the *res* under the process.").

The 24th JDC for Jefferson Parish asserted *quasi in rem* jurisdiction by issuing writs of attachment and sequestration, which the Jefferson Parish Sheriff served on the pig iron aboard the M/V CLIPPER KASASHIO on December 29 at 7:52 a.m. At the moment that seizure was effected, the state court's *quasi in rem* jurisdiction was established, and the *res* was withdrawn from the power of all other courts, including the Eastern District of Louisiana. *See Scarabin*, 966 F.2d at 993 (finding that a state court's *in rem* jurisdiction over a *res* attached at the moment of seizure). Thus, the U.S. Marshals Service's service of federal Rule B attachment papers and a Rule C warrant of arrest eight minutes after the Jefferson Parish Sheriff's action was legally invalid. All subsequent federal attachments were also invalid and must be vacated for lack of jurisdiction.

Stemcor, Daewoo, and ABN AMRO raise three arguments to resist this conclusion, none of which has merit. First, Stemcor argues that even if the 24th JDC for Jefferson Parish established *quasi in rem* jurisdiction on December 29, it subsequently lost jurisdiction when the M/V CLIPPER KASASHIO left Jefferson Parish on December 30 with the subject pig iron in its cargo hold. This argument ignores the fact that the vessel departed

Jefferson Parish because a judicial order from the Eastern District of Louisiana authorized the vessel to move within the port to discharge cargo.[79]  And while the pig iron was eventually sold and discharged at a location outside of Jefferson Parish, with the proceeds deposited in the registry of this Court, that too was done pursuant to a federal court order,[80] which was issued after the state had obtained exclusive jurisdiction over the *res*.   It is axiomatic that "[p]ossession obtained through an invalid seizure neither strips the first court of jurisdiction nor vests it in the second."  *United States v. $79,123.49 in U.S. Cash & Currency*, 830 F.2d 94, 98 (7th Cir. 1987); *see also United States v. One 1985 Cadillac Seville*, 866 F.2d 1142, 1146 (9th Cir. 1989) (rejecting the argument that "the fact of federal possession of the *res* takes jurisdiction from the state court and bestows it upon the district court").  Given the federal court's instrumental role in facilitating the pig iron's removal from the 24th JDC's control, permitting the pig iron's movement to divest the state court of jurisdiction would undermine the very purpose of prior exclusive jurisdiction doctrine.  *See United States v. One 1979 Chevrolet C-20 Van*, 924 F.2d 120, 123 (7th Cir. 1991) (explaining that jurisdiction obtained by possession alone "goes much too far"); *One 1985 Cadillac Seville*, 866 F.2d at 1146 ("[A]lthough

---

[79] R. Doc. 45.

[80] R. Docs. 85, 104.

. . . 'possession is nine-tenths of the law,' we prefer to apply the remaining one-tenth and decline to 'substitute a rule of force for the principle of mutual respect embodied in the prior exclusive jurisdiction doctrine.'").

Second, Daewoo and ABN AMRO argue that, for purposes of the prior exclusive jurisdiction doctrine, jurisdiction attaches when a plaintiff files its complaint, not when its attachment papers are served on the subject property. Thus, ABN AMRO and Daewoo contend that the Jefferson Parish Sheriff's "land speed" in serving the 24th JDC's attachment papers is irrelevant because Daewoo and Stemcor filed their federal suits before the state court litigation began. Because a court's jurisdiction in an *in rem* or *quasi in rem* suit derives from its control of the subject property, jurisdiction generally attaches at the point of seizure. *Scarabin*, 966 F.2d at 993 (explaining that a court's *in rem* jurisdiction over a *res* attached at the moment the property was seized). Although the Supreme Court has recognized an exception, in which the filling of a complaint may be treated as constructive possession of the property, that exception applies only "when the two suits have substantially the same purpose. . . ." *Penn Gen. Cas. Co.*, 294 U.S. at 196. Thus, when "two suits do not have substantially the same purpose[,] . . . the rule of constructive possession on the first filing of the bill is inapplicable, and the court first acquiring actual possession and control of the property thereby acquires

exclusive jurisdiction." *Cont'l Bank & Trust Co. v. Apodaca*, 239 F.2d 295, 298 (10th Cir. 1956).

The cases at issue in this action involve a number of different creditors asserting breach of contract claims, liens, and other claims against AMT. These claims turn on different facts and involve different transactions arising at different periods of time. The only commonality is that each plaintiff asserts claims against a single pig iron cargo belonging to defendants. This factor is not unique to this action; it exists in every litigation involving multiple creditors that attach the same property. Thus, applying the constructive possession rule to the facts of this case would cause the exception to swallow the general rule that *in rem* jurisdiction requires possession.

Third, ABN AMRO argues that regardless of whether the December 22 attachments served by the U.S. Marshall were valid, their legal effect was to prevent any other court from attempting jurisdiction over the *res* until the Eastern District of Louisiana resolved any disputes concerning its own subject matter jurisdiction. Thus, ABN AMRO concludes, the 24th JDC's seizure papers could have had no legal effect because they were served after the federal attachments but before this Court's ruling vacating those attachments for lack of jurisdiction. Although ABN AMRO cites several cases, none supports its interpretation of the prior exclusive jurisdiction doctrine. For

instance, ABN AMRO relies heavily on *Wabash Railroad Co. v. Adelbert College of the Western Reserve University*, 208 U.S. 38 (1908), quoting the following summary of the prior exclusive jurisdiction from that opinion: "[w]hen a court of *competent jurisdiction* has, by *appropriate proceedings*, taken property into its possession through its officers, the property is thereby withdrawn from the jurisdiction of all other courts." *Id.* at 54 (emphasis added). Far from supporting ABN AMRO's position, *Wabash Railroad*'s emphasis on "appropriate" proceedings as a prerequisite to operation of the prior exclusive jurisdiction doctrine emphasizes that the doctrine prevents a second court from asserting jurisdiction only if first court *lawfully* seizes and establishes control over the subject property. Other Supreme Court decisions are to similar effect. *See Freeman*, 65 U.S. at 454 ("[T]o give jurisdiction to the District Court in a proceeding *in rem*, there must be a valid seizure and an actual control of the *res* under the process."). ABN AMRO's argument therefore fails. Because the initial federal seizures in this case were invalid, federal jurisdiction did not attach, and the prior exclusive jurisdiction doctrine did not remove the pig iron from the jurisdiction of other courts.

For these reasons, the Courts finds that the 24th JDC for Jefferson Parish was the first court to validly exercise *quasi in rem* jurisdiction over the 9,000 tons of pig iron aboard the M/V CLIPPER KASASHIO. By operation of

the doctrine of prior exclusive jurisdiction, the Jefferson Parish Sheriff's service of the 24th JDC's seizure papers on December 29 at 7:52 a.m. deprived this Court of *quasi in rem* and *in rem* jurisdiction over the subject *res.* Accordingly, the Court grants TKM's motion to vacate all federal attachments that post-date the Jefferson Parish Sheriff's service of seizure papers for lack of subject matter jurisdiction--including the Rule B maritime attachments and Rule C arrest that Clipper obtained and that the U.S. Marshals Service served on the vessel eight minutes after the Jefferson Parish Sheriff's action.

In moving for an interlocutory sale of the pig iron in January 2013, the parties to this action expressly preserved all arguments against federal subject matter jurisdiction.  All parties also agreed that, "in the event is should be ultimately determined that this Court lacks subject matter jurisdiction . . . and that jurisdiction is proper in another court, the Clerk shall transfer the Deposited Funds to the registry of the court having proper jurisdiction subject to the claims preserved herein."[81]  This agreement is memorialized in the stipulated interlocutory sale orders issued by Judge Berrigan in January 2013, the Court.[82]  For the reasons discussed, the Court finds that it lacks *in rem* or *quasi in rem* jurisdiction over the *res* and that jurisdiction is proper in the

---

[81] R. Doc. 104 at 7 ¶ 12.

[82] R. Doc. 85, 104.

24th JDC for Jefferson Parish.  Consistent with the parties' agreed disposition, the Court therefore orders the proceeds of the sale transferred from the registry of this Court to the registry for the 24th JDC for Jefferson Parish.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS TKM's Motion to Vacate Attachments for Lack of Jurisdiction and to Transfer the Pig Iron Sale Proceeds to the Jefferson Parish 24th District Court.  The Court ORDERS the proceeds of the pig iron sale transferred from the registry of this Court to the registry for the 24th JDC for Jefferson Parish.

In light of this ruling, all plaintiffs' and intervening plaintiffs' claims to entitlement of the proceeds of the pig iron sale are DISMISSED AS MOOT. The only claims that potentially remain in this suit are Stemcor's and Daewoos' claims for remedies under the Convention and its implementing legislation. Based on the parties' briefs and the proposed pre-trial order, both parties have completed arbitration against defendants, thus rendering their request for an order compelling arbitration moot.  Although all arbitrations occurred a significant time ago, neither Stemcor nor Daewoo has moved this Court for confirmation of any arbitral award.   Accordingly, the Court will enter judgment DISMISSING Stemcor's and Daewoo's claims under the Convention.

New Orleans, Louisiana, this <u>4th</u> day of August, 2016.


_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE