UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

STEMCOR USA, INC.                                    CIVIL ACTION

VERSUS                                        NO.  12-2966, C/W 12-2968

AMERICA METALS TRADING, LLP                   SECTION "R" (1)
AND CIA SIDERURGICA DO PARA
(COSIPAR)

**THIS DOCUMENT RELATES TO ALL CASES**

**ORDER AND REASONS**

Before the Court is Daewoo International Corporation's motion for summary judgment[1] and Thyssen-Krupp Mannex GMBH's motion for partial summary judgment.[2]  For the following reasons, the Court grants Daewoo's motion for summary judgment, and denies TKM's motion for partial summary judgment.

I.      **BACKGROUND**

This case arises from competing attachments to the proceeds from the sale of 9,000 metric tons of pig iron which were aboard the M/V CLIPPER KASASHIO.  Although numerous parties initially claimed rights to the

---

[1]      R. Doc. 570.
[2]      R. Doc. 637.

proceeds, only two parties—ThyssenKrupp Mannex GMBH ("TKM"), and Daewoo International Corporation—remain to assert claims to the proceeds.

American Metals Trading, LLP ("AMT") is a British entity that sells pig iron on behalf of Cia Siderurgica do Para ("COSIPAR"), which produces pig iron.  AMT LLP also had a United States representative, AMT USA, which did business in the United States.[3]  Both plaintiffs allege that AMT LLP or AMT USA and COSIPAR failed to deliver on a number of their contracts, causing each plaintiff to sustain significant damages.  In an effort to obtain security for existing and/or anticipated judgments against defendants, both plaintiffs filed a complaint in the United States District Court for the Eastern District of Louisiana.  Plaintiffs also moved for and obtained various attachments on 9,000 metric tons of pig iron aboard the M/V CLIPPER KASASHIO.  It is the priority of these attachments that remains in dispute.

Between June 2010 and February 2011, TKM entered into six contracts with AMT USA for the purchase and sale of pig iron.[4]  Although TKM provided AMT USA with over $32 million in prepayments, AMT USA allegedly breached the contracts by failing to deliver any of the pig iron.[5] Following extensive negotiations, the parties reached a settlement on

---

[3]   *See* R. Doc. 644-3 at 12-13; R. Doc. 644-40 at 3.
[4]   R. Doc. 64-3 at 6 ¶ 16; R. Doc. 593-1 at 2.
[5]   R. Doc. 64-3 at 6 ¶ 16; R. Doc. 593-1 at 2.

February 2, 2012.[6]  Under that agreement, AMT USA, COSIPAR, and another entity, Usina Siderurgica de Para Limitada, acknowledged liability to TKM. TKM received a promissory note from these parties, secured by the pledge of a certain 20,000 metric tons of pig iron stored in Maraba, Brazil.[7]  TKM purportedly took steps to record the pledge in the Real Estate Registration Office of Maraba.[8]

When COSIPAR failed to pay under the settlement agreement, TKM went to court in Sao Paulo and sued all of the entities on the promissory note to enforce its pledge.[9]  The Court issued an order allowing TKM to arrest up to 20,000 metric tons of pig iron in enforcement of its pledge.[10]  TKM purportedly arrested the 20,000 tons of pig iron in Maraba.[11]  The scope of the arrest was specific to seizing the pig iron that was pledged to TKM.[12] When COSIPAR again failed to pay, TKM returned to court and received an order allowing it to attach any property that could be found of COSIPAR, and

---

[6]    R. Doc. 64-3 at 6 ¶ 16; R. Doc. 593-6.
[7]    *Id.* at 6-7 ¶ 18.
[8]    R. Doc. 593-1 at 2-3.
[9]    *See* R. Doc. 637-2 at 4.
[10]   R. Doc. 593-1 at 3.
[11]   *Id.* at 3.
[12]   R. Doc. 637-2 at 5 ¶ 10 n.3.

TKM attached an additional 9,170 tons of pig iron.[13]  On June 12, 2020, the Maraba court marshal converted the arrest into an attachment.[14]

On October 19, 2012, TKM learned that COSIPAR had removed most of the pig iron from Maraba.[15]  TKM returned to the same Sao Paulo court and requested an attachment on any of COSIPAR's property, including immovable property.[16]  It also requested that the court order COSIPAR to describe what happened to the pig iron in Maraba, and to return it.[17]  TKM did not ask for a specific attachment on pig iron of the same kind or quality, nor did it seek to have COSIPAR designate such property that would then be subrogated to TKM's pledge.  That court issued an order allowing for "non-specific attachment in respect of as many assets as may be necessary to cover the balance of the debt," but did not extend any pledge to those assets or require them to be of the same quality as the original pledged assets.[18]

TKM then arrested the 9,000 tons of pig iron on the M/V CLIPPER KASASHIO in the port of Itaqui.[19]  The pig iron in question was the property

---

[13]     *Id.* at 4.
[14]     *Id.* at 4.
[15]     R. Doc. 593-1 at 4.
[16]     R. Doc. 637-3 at 50-52.
[17]     *See id.* at 50-52.
[18]     *Id.* at 54-55.
[19]     *Id.* at 5; R. Doc. 593-9.

4

of AMT LLP,[20] which was being shipped to Louisiana for sale to a buyer, David Joseph of the David J. Joseph Company.[21]  Notably, although possible, TKM did not remove the pig iron from the vessel and take it into its own possession.  Moreover, TKM cannot trace the 9,000 tons of pig iron on the M/V CLIPPER KASASHIO to the 20,000 pledged to it in Maraba.[22]

While the pig iron was docked at the port in Itaqui, ABN AMRO, a former party to this suit, also moved for an attachment of the pig iron, which was granted by a separate judge.[23]  Clipper Bulk, which owned the vessel, moved to have the ABN attachment released so that the ship could set sail. The judge who had issued the ABN attachment released the ship, and it set sail for Louisiana.[24]  ABN appealed the decision, but the appeals court dismissed the appeal as it lacked jurisdiction once the ship set sail.[25]  TKM went to the judge who had issued its attachment and requested a clarification from that judge that the ship had wrongfully set sail.  The judge issued an *ex parte* order stating that the ship should not have set sail.[26]  TKM now argues

---

[20]    R. Doc. 644-8 at 42.

[21]    *See* R. Doc. 56

[22]    *See* R. Doc. 593 at 14 n.51.

[23]    R. Doc. 593-9 (TKM's attachment in Portuguese); R. Doc. 617-2 (same in English).

[24]    *See* R. Doc. 617-3.

[25]    R. Doc. 617-4.

[26]    R. Docs. 593-10 and 593-11 (Portuguese); R. Doc. 617-5 (English).

that by virtue of its pledge on the 20,000 metric tons of pig iron in Maraba, its attachment of the 9,000 metric tons aboard the M/V CLIPPER KASASHIO gives it priority to the *res*.

Daewoo had a contract with AMT LLP for the sale of pig iron.[27] However, despite receiving over $14 million in advance payments, AMT LLP never delivered the pig iron.[28] Daewoo pursued a money judgment claim in arbitration against AMT LLP and various members of the Montiero family that had ownership interests in AMT LLP. It received an arbitration award in the amount of $15,482,751.04 against those parties.[29] A New York Court confirmed and entered judgment on Daewoo's arbitration award.[30] Daewoo later filed that judgment in Louisiana state court.[31]

In December 14, 2012, both Daewoo and Stemcor, a former party to this suit, filed suit in the Eastern District of Louisiana.[32] Daewoo sued AMT LLP, COSIPAR, and Mineraco Carajas in this Court.[33] Daewoo alleged in the alternative that AMT LLP, COSIPAR and the Mineraco family were alter

---

[27]   R. Doc. 570-10 at 7-8.
[28]   *Id.*
[29]   R. Doc. 284-2 at 28-30.
[30]   R. Doc. 570-16.
[31]   R. Doc. 511-12.
[32]   R. Doc. 1; EDLA Civil Action No. 12-2968, R. Doc. 1.
[33]   Docket No. 12-2968, R. Doc. 1.

egos.[34]  Pursuant to Rule B and the Federal Arbitration Act, both plaintiffs sought writs of attachment of the pig iron cargo belonging to defendants aboard the M/V CLIPPER KASASHIO as security for future arbitration awards.[35]  Judge Ginger Berrigan and Judge Eldon Fallon issued orders directing the Clerk of Court to issue the writs of attachment requested by Daewoo and Stemcor.[36]  These cases were consolidated into a single action on December 27, 2012.[37]

TKM filed a suit in the 24th JDC for Jefferson Parish on December 28, 2012 against COSIPAR and AMT USA.[38]  In its state suit, TKM sought a writ of attachment and sequestration of the pig iron cargo aboard the M/V CLIPPER KASASHIO.  TKM's suit was premised on the idea that the pig iron on the M/V CLIPPER KASASHIO was part of the 20,000 tons of pig iron on which it had a pledge, a premise later discovered to be faulty.  The state court approved TKM's request for a writ of attachment.  The Jefferson Parish Sheriff then served seizure papers issued by the 24th JDC on the cargo on

---

[34]  *Id.* at 4.
[35]  R. Doc. 2; EDLA Civil Action No. 12-2968, R. Doc. 2.
[36]  R. Doc. 9; EDLA Civil Action No. 12-2968, R. Doc. 11.
[37]  R. Doc. 24.
[38]  R. Doc. 441-1 at 104-10; R. Doc. 69-1 at 200.

December 29, 2012.[39]   At the time, the M/V CLIPPER KASASHIO was anchored in Jefferson Parish at Kenner Bend.

On January 7, 2013, TKM moved to intervene in these proceedings and sought a Louisiana state law writ of attachment and sequestration.[40]   TKM's intervenor complaint alleged claims against COSIPAR and AMT USA.[41] TKM alleged that the cargo was subject to a security interest in its favor, again under the theory that it was part of the pledged pig iron that had been stored in Maraba.[42]   Judge Berrigan granted TKM's motions, and the U.S. Marshals Service served TKM's federal writs of attachment on January 11.[43]

On January 11, all plaintiffs and intervening plaintiffs who had appeared in this action filed a joint motion for the interlocutory sale of defendant's pig iron cargo to Duferco SA, another party who was dismissed from this suit.[44]   Judge Berrigan granted the parties' motion, and the 9,000 metric tons of pig iron were sold on January 29.[45]   In accordance with the

---

[39]   R. Doc. 441-1 at 111-21.
[40]   R. Doc. 64; R. Doc. 66.
[41]   *See* R. Doc. 69.
[42]   *See id.* 8.
[43]   R. Doc. 68; R. Doc. 72.
[44]   R. Doc. 75; R. Doc. 80.
[45]   R. Docs. 85, 104, 108.

parties' agreement, the proceeds were deposited into the registry of court for the Eastern District of Louisiana.[46]

On January 5, 2016, this case was reassigned from Judge Berrigan to Section R of this Court for all further proceedings.  TKM filed a motion to vacate attachments for lack of subject-matter jurisdiction and to transfer the pig iron sale proceeds to the Jefferson Parish 24th JDC.[47]  Daewoo opposed the motion, as did other plaintiffs which are no longer parties to this case.[48] TKM argued that the initial federal attachments in this action were void for lack of subject-matter jurisdiction and that the first court to validly attach the pig iron cargo was the 24th JDC for Jefferson Parish.

On August 4, 2016, the Court issued an order granting TKM's motion to vacate all maritime and state law attachments of the *res*.[49]  Once Daewoo's December 22, 2012, attachment was vacated, TKM's state court attachment became first in time, and the Court found that jurisdiction to resolve the dispute rested solely with the state court.  The Court therefore dismissed all plaintiffs' and intervening plaintiffs' claims to entitlement of the proceeds of the pig iron sale without prejudice.[50]  The Court also ordered the proceeds of

---

[46]    R. Doc. 108; R. Doc. 104 at 6 ¶ 9.

[47]    R. Doc. 436.

[48]    R. Docs. 442-45.

[49]    R. Doc. 470.

[50]    *Id.* at 58.

the pig iron sale transferred from the registry of this Court to the registry for the 24th JDC for Jefferson Parish.[51]

Daewoo appealed this Court's order to the Court of Appeals for the Fifth Circuit.[52]  In the meantime, Daewoo also moved to intervene in the state court action, and requested a stay of the state court proceedings pending the outcome of its appeal and the federal litigation.[53]  TKM filed a brief in support of this motion, arguing that "judicial economy and fundamental fairness" required that the state litigation be stayed.[54]  It reasoned that if Daewoo were successful in federal court, it would prime TKM.  TKM would then no longer have a stake in the matter because only Daewoo would have "a viable dispute" with ABN over ABN's claims.[55]  The state court granted this motion, and ordered the state court case stayed until "the federal action . . . has been discontinued or final judgment has been rendered."[56]

After certifying a question to the Louisiana Supreme Court, the Fifth Circuit held that the Court had subject-matter jurisdiction under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards,

---

[51]   *Id.*; R. Doc. 472.
[52]   R. Doc. 481; R. Doc. 482.
[53]   *See* R. Doc. 537-8.
[54]   R. Doc. 570-26 at 23.
[55]   *Id.* at 26.
[56]   R. Doc. 537-9.

that Louisiana's non-resident statute allowed for an attachment in aid of arbitration, and that therefore Daewoo properly asserted such an attachment. *See Stemcor USA Inc. v. CIA Siderurgica Do Para Cosipar*, 927 F.3d 906, 911-12 (5th Cir. 2019). Accordingly, the Fifth Circuit therefore vacated this Court's August 4, 2016, judgment and remanded. *Id.* Upon remand, the Court first instructed the parties to brief whether the Court retained prior exclusive jurisdiction over the proceeds.[57] Both Daewoo and TKM argued this Court retained jurisdiction,[58] and the Court found that had prior exclusive jurisdiction.[59]

The Court now turns to the issue of which of the remaining parties has a superior right to the pig iron proceeds. The parties have filed cross-motions for summary judgment on the issue.[60] Despite the numerous issues at play, this dispute can be summarized as follows: Does TKM have a Brazilian interest in the pig iron that provides it with a claim superior to Daewoo's December 22, 2012 attachment based on Louisiana's non-resident attachment statute? As explained below, the answer to that question is no.

---

[57]   R. Doc. 530.
[58]   R. Doc. 538 (Daewoo); R. Doc. 546 (TKM, marked deficient).
[59]   R. Doc. 564.
[60]   R. Doc. 570 (Daewoo); R. Doc. 637 (TKM).

## II.    LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075.  "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).  "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution. *See, e.g.*, *id.*; *Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion,

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322 (emphasis added))).

The Court notes that this matter was set for bench trial. "[E]ven at the summary judgment stage a judge in a bench trial has the limited discretion to decide that the same evidence, presented to him or her as trier of fact in a plenary trial, could not possibly lead to a different result." *Matter of Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991). This is because "it makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact." *Id.*

## III.  DISCUSSION

### A.   Judicial Admission

Daewoo argues that TKM is estopped from claiming an interest in the pig iron proceeds (other than its state-law lien) based on the doctrine of judicial admission. Specifically, in TKM's answer to ABN's verified petition in the state court, it made the following admission in response to an ABN allegation:

> It is however admitted that the pig iron loaded on the M/V CLIPPER KASASHIO was owned by COSIPAR and that after thorough investigation, TKM has determined that it cannot be proved that the pig iron loaded onto the M/V CLIPPER KASASHIO was pledged to TKM or ABN. The evidence establishing a chain of custody of the pledged pig iron from the Maraba storage yard to the Itaqui port storage area to the M/V CLIPPER KASASHIO does not exist. TKM instead claims a security interest in the pig iron based on the lien conferred upon the first legitimate attaching creditor by La. C.C. P. Art. 3511 by TKM obtaining a judgment against ATM and COSIPAR, and the interest conferred by its UCC filing.[61]

The Fifth Circuit defines a judicial admission as a "formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them." *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir. 2001). A judicial admission is conclusive and withdraws a fact from contention. *Id.* at 476-77. To qualify as a judicial admission, a statement must be "deliberate, clear, and unequivocal." *Heritage Bank v. Redcom Laboratories, Inc.*, 250 F.3d 319, 329 (5th Cir. 2001). Moreover, "for a statement of counsel to qualify as a judicial admission it must be made intentionally as a waiver, releasing the opponent from proof of fact." *United States v. Charvez-Hernandez*, 671 F.3d 494, 501 (5th Cir. 2012).

---

[61]   R. Doc. 570-26 at 19-20.

TKM's answer is a judicial admission.  It is a "deliberate, clear, and unequivocal" admission that TKM could not demonstrate a pledge on the 9,000 tons of pig iron aboard the M/V CLIPPER KASASHIO.  *Heritage Bank*, 250 F.3d at 329.  TKM explicitly stated that "it cannot be proved that the pig iron loaded onto the M/V CLIPPER KASASHIO *was pledged* to TKM or ABN."[62]  The reason TKM admitted it could not prove that the pig iron was pledged to it was because it could not establish a chain of custody between the pig iron in Maraba on which it had a pledge and the pig iron in Itaqui.[63]  It therefore represented that it would *instead* rely upon its state law lien, as it could not rely upon a Brazilian law pledge on the pig iron.[64]  TKM's answer therefore acts as a judicial admission that waives any argument that it had a Brazilian law pledge on the pig iron at issue in this case.  As explored in more detail below, TKM's unequivocal admission that it did not have a Brazilian law pledge on the 9,000 tons of pig iron on the M/V CLIPPER KASASHIO is dispositive of this case.

## B.    Judicial Estoppel

In light of the Court's ruling on TKM's admission that it cannot prove a pledge on the pig iron, the Court need not address Daewoo's argument

---

[62]    R. Doc. 570-26 at 19-20 (emphasis added).

[63]    *Id.*

[64]    *Id.*

regarding TKM's representations on the stay motion in the 24th JDC. Nevertheless, the Court notes that virtually every argument advanced by TKM now is diametrically opposed to arguments it made previously. As noted, it previously argued to the 24th JDC that a valid attachment by Daewoo would outrank its interest. Further, in its opposition to ABN's motion to intervene in the state court litigation, TKM expressed a completely different understanding of the applicable state law on secured transactions than it now asserts.[65] What is more, TKM's Brazilian law expert has made a complete about-face on a fundamental issue of law in this case. And most remarkable, after spending four years arguing that the 24th JDC has jurisdiction over this dispute, TKM now argues a Brazilian court has sole jurisdiction. This makes TKM a quintessential "chameleonic litigant" against whom judicial estoppel is usually appropriate. *Hibernia Nat. Bank v. Carner*, 32 F.3d 565, *2 (5th Cir. 1994).

### C.    TKM's Brazilian Pledge – Brazilian Law

TKM's judicial admission puts an end to the issue of the validity of its asserted Brazilian Pledge. Nevertheless, because of the tortured history of

---

[65]    *Compare* R. Doc. 570-26 at 10-11 (discussing the choice of law provision under La. R.S. 10:9-301 and the requirement a lien be perfected) *with* R. Doc. 593 at 14-19 (taking the opposite position on which law applies under La. R.S. 10:9-301 and arguing that a lien need not be perfected).

this litigation, the Court includes an alterative analysis of TKM's argument that it has a perfected security interest stemming from the original pledge on 20,000 tons of pig iron in Maraba, Brazil.

TKM claims this perfected security interest arises from its pledge on 20,000 metric tons of pig iron stored in Maraba, Brazil, which takes priority over Daewoo's lien.  TKM admits that the 9,000 tons of pig iron at issue here, which were loaded on the M/V CLIPPER KASASHIO, cannot be traced to the 20,000 tons in Maraba over which it had a perfected security interest.[66]  But TKM argues for the first time that a Brazilian law concept it calls "replenishment" or "universality" extends its perfected pledge to any other COSIPAR pig iron it later attached.  Daewoo disputes the existence of a "replenishment" principle in Brazilian law, and argues that TKM's Brazilian law expert—Leonardo Grebler—is barred from providing an opinion supporting this concept.

### 1.   *Grebler's Statement*

Before addressing TKM's theory on the merits, the Court first addresses Daewoo's argument that TKM is barred from making the argument that "replenishment" exists in Brazilian law based on TKM's expert's statement, because TKM failed to comply with the Court's

---

[66]   *See* R. Doc. 593 at 14 n.51.

Scheduling Order.  The Court entered a Scheduling Order setting a deadline

for

> [w]ritten reports of experts, as defined by Federal
> Rules of Civil Procedure 26(a)(2)(B), who may be
> witnesses for Plaintiffs fully setting forth all matters
> about which they will testify and the basis therefore
> shall be obtained and delivered to counsel for
> Defendant as soon as possible, but in no event later
> than April 29, 2016.[67]

In TKM's witness list, it stated that Leonardo Grebler will testify "as a

rebuttal expert on Brazilian law as more specifically stated in his reports

dated October 23, 2015 previously submitted to all parties in this

litigation."[68]  Similarly, in the pre-trial order the parties submitted on August

2, 2016, TKM stated that Grebler will testify "as a rebuttal expert on Brazilian

law as more specifically stated in his reports dated October 23, 2015 and May

9, 2016."[69]

Despite the Court-ordered April 2016 deadlines, TKM now relies

almost exclusively on the *2020* "statements" of Leonardo Grebler and the

exhibits he attaches to argue for the first time that it retains a perfected

security interest on the proceeds at issue based on the doctrine of

---

[67]   R. Doc. 427 at 2.

[68]   R. Doc. 405.

[69]   R. Doc. 618-8 at 77-78.

replenishment.[70]  "[E]xpert testimony accompanied by extracts from foreign legal material is the basic method by which foreign law is determined." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 713 (5th Cir. 1999).

Grebler's statement is in effect an undisclosed and untimely expert report on Brazilian law.  "When a party fails to timely disclose information required by Federal Rule of Civil Procedure 26(a), 'the party is not allowed to use that information . . . to supply evidence on a motion . . . or at trial, unless the failure was substantially justified or harmless."  *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 372 (5th Cir. 2016) (quoting Fed. R. Civ. P. 37(c)(1)).

The Fifth Circuit described four factors to determine whether to exclude evidence that was not properly designated:  (1) the explanation for the failure to adhere to the deadline; (2) the importance of the proposed modification of the scheduling order; (3) the potential prejudice that could

---

[70]   In its opposition to Daewoo's motion for summary judgment, TKM relies on the March 6, 2020 statement of Grebler.  R. Doc. 593-1.  In its motion for summary judgment, TKM also relies on an additional forty-six page May 12, 2020 statement of Leonardo Grebler, which largely restates his previous declaration and responds to the arguments of Daewoo's expert, Joel Ferreira Vaz Filho that are made in response to Grebler's original 2020 statement.  *See* R. Doc. 637-2.  This statement is similarly belated, and the analysis regarding the timing of these statements applies to both.

result from allowing the modification; and (4) the availability of a continuance to cure that prejudice. *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d at 368 (citing *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990)). Here, these factors weight heavily in favor of exclusion of Grebler's 2020 statements.

As to the first factor, TKM failed to move for a modification of the scheduling order and failed to substantially justify its lateness or show a lack of prejudice. Instead, it *unilaterally* submitted the 2020 expert statements. Notably, before filing its motion for summary judgment, Daewoo expressly asked TKM if it would rely on a new expert report, and if so, it asked TKM to circulate it before the parties filed their briefs.[71] TKM declined to do so.[72]

TKM argues that the deadlines in the Court's scheduling order should not apply because they were initially aimed at a trial date that was cancelled in light of this Court's August 4, 2016 order. But that order, and the parties' subsequent appeals, did not vitiate the deadlines that had already passed in this litigation. The Court made clear that it would decide this matter on the briefs and set out a scheduling order over five months before TKM filed its

---

[71]   R. Doc. 644-19.

[72]   *Id.*

response.  If TKM planned to file a new statement of its Brazilian law expert, it could have ask the Court for leave to do so.  It did not.

Absent substantial justification for, or lack of prejudice from, the late disclosure, Grebler's statements would be subject to exclusion even if they were consistent with his earlier his report.  But here, Grebler's 2020 statements directly *contradict* the expert report that was timely filed.  In his 2016 declaration, which was presumably drafted with a dispute with ABN in mind, Grebler stated:

> *Neither the TKM pledge* nor the ABN pledge *was meant to be perfected on a class of goods*, that is, any pig iron present on Cosipar's premises.  Rather, they were perfected on *a specific set of goods* of one same class, which set could and presumably was segregated from the other sets of same goods, by means of piles in different locations in the premises. I submit that *a commercial pledge on a class of goods, actual or future,* does *not exist under Brazilian laws*.[73]

Now that ABN is no longer a party to the lawsuit, Grebler's recent declaration makes a complete change in position, arguing that one can in fact have a pledge on a class of goods.  He now states:

> Under the replenishment concept, if the pledgor without the consent of the pledgee disposes of the specific pledged lot of fungible collateral, the security interest created by the pledge and its perfection by recordation extends to any (of all) assets of the same

---

[73]    R. Doc. 617-7 at 3 (emphasis added).

> nature and quantity as the original assets, and the pledgee may attach any such assets of the pledgor wherever found.[74]

These statements directly contradict Grebler's earlier declaration, as he essentially argues that a commercial pledge on a class of goods *can* exist under Brazilian law via the replenishment theory.  TKM and Grebler attempt to distinguish Grebler's 2020 statements by pointing out that Grebler's 2015 declaration was written in the context of arguing against ABN, and Grebler's new statement was written in the context of litigation with Daewoo.  But TKM's change in its litigation position is not an acceptable explanation for its expert's complete reversal on the substance of Brazilian law.  TKM also argues that the statements are not inconsistent, as Grebler's *de facto* class-wide pledge idea is triggered only if "the pledgor without the consent of the pledgee disposes of the specific pledged lot of collateral."  But the debtor had disposed of the pledged collateral without TKM's consent at the time Grebler made the 2015 categorical statement that a pledge on a class of goods, present or future, does not exist under Brazilian law, and he made no mention that such an event would extend a pledge over property of the same class.  As the "replenishment" principle Grebler now advances directly

---

[74]     R. Doc. 593-1 at 9 ¶ 29.

contradicts Grebler's earlier, unqualified statement that a party cannot pledge a class a goods, these statements are plainly contradictory.

Here, the Court finds that TKM's failure to adhere to the deadline resulted entirely from the fact that TKM's 2015-2016 legal position vis-à-vis ABN was a losing one when it applied to Daewoo in 2020. This is clear from a comparison of his old and new positions. This inconvenient situation called for a new expert statement that directly contradicted Grebler's earlier report. The first factor—explanation for failure to adhere to the deadline—thus weighs heavily in favor of exclusion.

Moreover, the Court finds that TKM's belated disclosure of Grebler's 2020 statements significantly prejudiced Daewoo. Although Daewoo's expert, Joel Ferreira Vaz Filho, was able to respond to Grebler's first 2020 statement, Daewoo was significantly prejudiced by being forced to respond to new, contradictory arguments raised for the first time in an opposition to Daewoo's motion for summary judgment. The belated disclosure also created additional legal and expert expenses for Daewoo that it otherwise would not have incurred. The existence of this prejudice militates heavily toward the exclusion of the 2020 Grebler statements. Accordingly, the Court finds that Grebler's 2020 statements must be excluded pursuant to Federal Rule of Civil Procedure 37.

TKM's argument that it has a right to the proceeds based on its pledge on the 20,000 tons of pig iron in Maraba is based solely on a principle of law set out in an excluded expert statement.  This alone is reason enough to find that the Maraba pledge does not extend to the pig iron aboard the M/V CLIPPER KASASHIO.   But in the interests of putting an end to this litigation,   the   Court   will   alternatively   consider   TKM's   asserted replenishment principle.

### 2.   *"Replenishment" or "Universality"*

As discussed above, TKM had a pledge, which was a perfected security interest, in the 20,000 tons of pig iron stored in Maraba.  TKM now relies on Grebler to argue that this pledge extends to the 9,000 tons aboard the M/V CLIPPER   KASASHIO   through   the   operation   of   the   purported "replenishment" principle of Brazilian law.  Boiled down, the principle supposedly states that a creditor with a pledge on fungible goods may extend the pledge to other goods of the same kind and quality if the original goods are sold or cease to exist.  The Court finds that TKM cannot avail itself of such a principle here.

As Brazil is a civil law country, the starting point for legal analysis is the Brazilian Civil Code.  Here, TKM's pledge is initially based on Article 1447 of the Civil Code, which allows for a pledge on raw materials and industrial

products.[75]  TKM's pledge was also made pursuant to Article 1424(IV) of the Civil Code, which states:  "[t]he contracts of a pledge, antichresis, and mortgage, shall declare, under penalty of not being effective . . . [t]he asset given as security, with its specifications."[76]  TKM's pledge agreement fulfilled this requirement, as it listed the specific 20,000 tons of pig iron specifically stored in Maraba and with certain features and specifications.[77]  Finally, TKM recorded this pledge with the Real Estate Registration Office of Maraba, as required for industrial or commercial pledges by Brazilian Civil Code Article 1448.[78]

TKM therefore had a proper pledge on the 20,000 tons of pig iron specified in the pledge that were stored in Maraba.  The problem, though, is that the pig iron that was stored in Maraba is not at issue in this case.  As noted, TKM has conceded that the 9,000 tons of pig iron aboard the M/V CLIPPER KASASHIO cannot be traced to the pig iron it had a pledge on.[79]

---

[75]   R. Doc. 617-1 at 22 ("Art. 1447.  The following may be the object of a pledge: . . . raw materials, and industrial products.").

[76]   *Id.* at 16-17.

[77]   *See* R. Doc. 69-1 at 150 (Pledge Agreement listing the Pledge applies to 20,000 tons with specifications listed in Annex A, *id.* at 57, and stored in the facilities listed in Annex B, *id.* at 158).

[78]   R. Doc. 617-1 at 22 ("Art. 1448.  An industrial or commercial pledge is constituted by notarial act or private writing recorded in the Immovable Property Registry of the district where the pledged things are located.").

[79]   R. Doc. 570-26 at 21.

Because the Brazilian Civil Code specifically states that pledges "shall declare *under penalty of not being effective* . . . the asset given as security, with specifications,"[80] and TKM indisputably had no pledge agreement specifically listing the 9,000 tons of pig iron at issue here, a straightforward application of the Brazilian Civil Code results in the conclusion that TKM had no pledge on the 9,000 tons aboard the M/V CLIPPER KASASHIO.

TKM nevertheless argues that the "replenishment" principle extends TKM's pledge on the Maraba pig iron to the 9,000 tons of pig iron on the M/V CLIPPER KASASHIO.  TKM contends that pig iron is fungible property within the meaning of a separate part of the Brazilian Civil Code, Article 85, because it is property "which may be substituted by other property of the same kind, character, or property."[81]  Notably, this article merely defines fungible property and is not cross-referenced or cited in the Civil Code Articles regarding pledges.  TKM relies on Grebler, who relies on a treatise by Pablo Renita, to argue that Article 1447 of the Brazilian Civil Code consolidated older law on commercial and industrial pledges, and that when pledged items are fungible and are "raw materials and goods intended to be used in the short term," the debtor is permitted to resell them without the

---

[80]     *Id.* at 16-17.
[81]     R. Doc. 593-1 at 6.

creditor's consent.[82]  Renita states that "[t]his [concept] arises from the very essence of things, since the merchant or farmer who places his pledged assets in the marketplace may not be deprived of his business activity, which is indispensable to his financial survival."[83]  According to Renita and Grebler, the security interest may then attach to other goods of the same nature and characteristics so as not to harm an innocent creditor.[84]  Implicit in this conclusion of Renita's, which is relied on by Grebler, is a recognition that a security interest may attach to an entire class of goods.  This is the exact conclusion Grebler expressly rejected earlier in this litigation in stating: "I submit that a commercial pledge on a class of goods, actual or future, does not exist under Brazilian laws."[85]  He also asserted that TKM's pledge was never intended to be perfected on a fungible class of goods.[86]

In reaching this conclusion, Renita relies on two Brazilian court cases, each dealing with commercial debtors in *concordia*, or bankruptcy, a circumstance that does not apply here.  One case, which dates to 1999,[87] was

---

[82]   *Id.* at 8.
[83]   R. Doc. 593-17 at 4 (citing R. Doc. 593-18 at 8).
[84]   *Id.* at 5.
[85]   R. Doc. 617-7 at 3.
[86]   *Id.*
[87]   R. Doc. 593-19 (*Superior Tribunal de Justica* Special Appeal No. 230,997).

before the current Brazilian Civil Code;[88] the other simply directly quotes that case.[89]   Notably, neither case cites to the relevant articles of the Brazilian Civil Code.

The problem with TKM's replenishment argument is that it runs headlong into the plain language of the Brazilian Civil Code, which is the primary source of law in a civil law country such as Brazil.   As discussed above, Article 1424 of the Brazilian Civil Code requires that a pledge be made on specific goods "under penalty of not being effective."[90]   Article 1436 provides that the pledge is extinguished upon the loss of the thing pledged, although the debt remains.   And the article providing a remedy to creditors does not allow for the remedy TKM seeks here.   Article 1425 provides that "[t]he debt is considered mature: (1) If the asset given as security having deteriorated or depreciated, the security has diminished, and the debtor, despite demand made on him, fails to reinforce or substitute the security; [or] (IV) If the asset given as security perishes and is not substituted by another."[91]   Notably, the remedy provided for deterioration or loss of a security is that the debt is considered mature—the remedy is not a right of

---

88   R. Doc. 617 at 2.

89   R. Doc. 593-18 (*Superior Tribunal de Justica* Special Appeal No. 199,671).

90   R. Doc. 617-1 at 16.

91   *Id.* at 17-18.

the creditor to help himself to a pledge on new, previously unpledged goods. Moreover, the substitution referred to in Article 1425(IV) allows the *debtor* to identify substitute collateral to prevent the debt from maturing.   But nowhere in the Brazilian Code is the *creditor* given the right to select any new goods of the debtor's to add to its pledge.   And Article 1422 of the Brazilian Code also makes clear that a debtor can execute only on pledged collateral, as it stated: "[t]he mortgage creditor and pignorative creditor have the right to executive *upon the thing mortgaged or pledged,*"[92] but it offers no remedy as to unpledged collateral.

Indeed, the Brazilian Code explicitly addresses the issue of a debtor altering or moving pledged items.   Article 1449 of the Brazilian Civil Code states that "[t]he debtor cannot, without the creditor's written consent, alter the pledged things or move them from the location, nor dispose thereof.   The debtor that, with the creditor's consent, alienates the pledged things, must replace them with other assets of the same nature, which shall be subrogated to the pledge."[93]   This article prohibits a debtor from moving or disposing of goods that are subject to a pledge without the creditor's consent, but if he does so, the article does not authorize a *creditor* to pick out other goods and

---

[92]     *Id.* at 17 (emphasis added).
[93]     *Id.* at 22.

subject them to the original pledge.  Nor does either Article 1447 or Article 1449 of the Brazilian Civil Code make any mention of a distinction between "raw materials and industrial products" that are fungible, and the other goods listed in Article 1447 such as machines and tools, which are not.

Moreover, there are additional reasons to reject the application of the replenishment theory as advocated for by TKM.  The Renita treatise relies heavily on two Brazilian court cases from the Superior Court of Justice of Brazil.[94]  But Vaz Filho points to a separate case from the same court that comes to the opposite outcome, and applies a different rule of law.  That case states:

> "When the real right of collateral falls on a specific property, the former cannot persist after the disappearance of the latter.  Note, however, that the perishing of the pledge object only leads to the extinction of the real right of collateral and not the credit guaranteed by it.  The latter remains.  Its holder only loses preference and moves to the condition of unsecured creditor."[95]

The case continues: "[t]he right of collateral grants the creditor privilege only on the proceeds of sale of the goods that constitute collateral; the remaining

---

[94]    R. Doc. 593-19 (*Superior Tribunal de Justica* Special Appeal No. 230,997); R. Doc. 593-18 (*Superior Tribunal de Justica* Special Appeal No. 199,671).

[95]    R. Doc. 617-10 at 6 (*Superior Tribunal de Justica* Special Appeal No. 31.290-9).

balance shall be unsecured credit."[96]  In other words, the Superior Court of Justice previously found that a perfected pledge cannot continue to exist once the pledged property disappears.  Grebler contends that this case is distinguishable as it deals with a debtor in bankruptcy who is no longer in business, and deals with bills of exchange, which it contends are non-fungible.  But the Superior Court of Justice makes no such distinction in its order.  This result, which is in juxtaposition to the theory and cases TKM and Grebler rely upon, further casts doubt on the replenishment principle.

Furthermore, these cases emanate from the Superior Court of Justice of Brazil.  Vas Filho argues that Brazil is a civil law country, and therefore, unlike common law jurisdictions, Brazilian law is set forth in express code provisions rather than judicial opinions.[97]  The Court notes that the 2006 Brazilian Constitution was amended to expressly allow for the *Federal Supreme Court* of Brazil to issue binding, precedential decisions under certain circumstances.  *See* Constitution of Brazil, Article 103-A (2006) ("The Federal Supreme Court may, *ex-officio* or upon request, upon decision of two thirds of its members, and following reiterated judicial decisions on constitutional matter, issue a summula (restatement of case law) which . . .

---

[96]    *Id.* at 7.
[97]    R. Doc. 617 at 12 ¶ 34.

shall have binding effect upon the lower bodies of the Judicial Power."). The Brazilian Constitution contains no such provision regarding the Superior Court of Brazil, which indicates that the opinions relied on by Renita and Grebler are not binding caselaw in Brazil.

Notably, TKM's theory is undermined by the fact that TKM, represented by Grebler, did not seek to extend its Brazilian law pledge to the 9,000 tons of pig iron aboard the M/V CLIPPER KASASHIO when it took action in the Brazilian Court in Itaqui.   After TKM learned of the disappearance of the pig iron, it returned to the Court that had initially arrested the Maraba pig iron.  Tellingly, TKM did not claim to be extending its pledge to new property to be seized, and it did not ask the Brazilian Court to recognize that its pledge extended to new pig iron.[98]  Nor did it ask the Brazilian Court to order COSPIAR to designate property of the same kind and quality.  And it did not ask the court for an attachment on property of the same kind and quality as the original pledged assets and to subrogate it to its pledge.[99]   Rather, it requested an attachment on *any* of COSIPAR's property, and it requested that the court order COSIPAR to describe what happened to the pig iron in Maraba, and to return it.[100]  That court issued an

---

[98]     *See* R. Doc. 637-3 at 50-52.

[99]     *See id.* at 50-52.

[100]    *See id.* at 50-52.

order allowing for "non-specific attachment in respect of as many assets as may be necessary to cover the balance of the debt," but it did not extend any pledge to those assets or require them to be of the same quality as the original pledged assets.[101]

TKM then seized the 9,000 tons of pig iron on the M/V CLIPPER KASASHIO.  But neither the seizure order[102] nor the order issued by the Brazilian judge after the ship set sail[103] suggests that these orders were designed to extend TKM's pledge on the Maraba pig iron to the 9,000 tons at issue here.  Rather, TKM only now seeks *post hoc* to have the attachments it obtained on the 9,000 tons of pig iron operate to extend its pledge over the Maraba pig iron—a position driven entirely by its changed litigation stance.

Consistent with this history, TKM has previously *admitted* it did not extend its pledge on the Maraba pig iron to the pig iron on board the M/V CLIPPER KASASHIO.  As discussed above, in its answer to the verified petition in the intervention of ABN before the 24th JDC, TKM stated that it is "admitted that the pig iron loaded on the M/V CLIPPER KASASHIO was owned by COSIPAR and that after thorough investigation, TKM has determined that it cannot be proved that the pig iron loaded on the M/V

---

[101]   *Id.* at 54-55.
[102]   R. Doc. 617-2.
[103]   R. Doc. 617-5.

CLIPPER KASASHIO was *pledged* to TKM or to ABN."[104]   This binding judicial admission by TKM demonstrates that the replenishment theory did not function to extend TKM's pledge to the pig iron on the M/V CLIPPER KASASHIO.

In addition to the foregoing reasons, the Court notes that the source of the replenishment principle is Grebler.  But the Court cannot rely on Grebler as a faithful exponent of Brazilian law.  Grebler was TKM's lawyer in connection with the pledge transaction and the Itaqui enforcement proceedings.  His intimate involvement in the underlying events robs him of the professional detachment the Court expects from expert witnesses.  Then there is his about-face on whether a pledge on a class of goods can exist in Brazil, which suggests that his views are result driven.  And his failure to assert the replenishment principle when he represented TKM in the Itaqui attachment proceedings where, according to him, he was in a forum that accepts this principle, speaks volumes.  Grebler's unreliability makes the Court distrust the significance and representiveness of the extracodal sources he cites for his newfound replenishment argument.  The Court finds Vaz Filho presents the more accurate interpretation of Brazilian law that no such a replenishment principle applies in the way TKM asserts here.

---

[104]   R. Doc. 570-26 at 21.

Finally, even if there were a Brazilian replenishment principle of the sort TKM advances, TKM has never demonstrated that the goods seized on the M/V CLIPPER KASASHIO in Itaqui were of the same nature and quality as the pledged assets in Maraba. Indeed, the chemical composition of the pig iron at issue is different from that of the specified pledged assets in Maraba.[105]

Because the Court does not credit TKM's replenishment theory, the Court finds that TKM's pledge did not create a security interest in the 9,000 tons of pig iron it attached aboard the M/V CLIPPER KASASHIO. The Court therefore need not reach Daewoo's argument that TKM failed to perfect its interest security interest in the pig iron aboard the vessel by taking possession of it.

## C.    TKM's Brazilian Pledge – Louisiana Law

The Court's finding that TKM lacks a Brazilian security interest in the 9,000 tons of pig iron at issue in this case essentially brings the matter to a close. TKM is left with its state law attachments from the 24th JDC, which are lower in priority to Daewoo's claims. But the parties have devoted significant briefing to arguments regarding whether, had TKM managed to

---

[105]    *See* R. Doc. 618-3 (certificate of quality); R. Doc. 251-9 at 12 (pledge agreement).

have a security interest, that interest would remain perfected under *Louisiana* law. The parties also dispute whether an unperfected security interest would prime Daewoo's claim. Although these issues are essentially moot in light of the Court's analysis of Brazilian law, *supra*, and the Court's discussion of comity, *infra*, in the interest of addressing these arguments and bringing finality to this dispute, the Court addresses the parties arguments regarding Louisiana secured transaction law. For the purposes of this section, the Court assumes that TKM had successfully argued it had a perfected security interest on the 9,000 tons of pig iron aboard the M/V CLIPPER KASASHIO based on its Brazilian law pledge.

### 1. *Choice of Law*

There is a dispute between the parties as to what portion of the Louisiana Secured Transactions code applies to TKM's purported interest. To examine this issue, the Court turns to La. R.S. 10:9-301, which is the section of the code that governs choice of law. As to perfection, La. R.S. 10:9-301(1) states that Brazilian law governs. It states: "Except as otherwise provided in this Section, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral." Thus, because the relevant debtor here was COSIPAR, a Brazilian resident,

37

Brazilian law governs unless another provision overrides the general rule. Here, another provision does apply.  La. R.S. 10:9-301(3) states: "[W]hile tangible negotiable documents, goods, instruments, money, or trangible chattel paper is located in a jurisdiction, the local law of that jurisdiction governs . . . the effect of perfection or nonperfection and the priority of a nonpossessory security interest in the collateral."  La. R.S. 10:9-301(3)(C). Louisiana law therefore controls "the effect of perfection or nonperfection and the priority of a nonpossessory security interest in the collateral," while Brazilian law governs "perfection."[106]

Because Brazilian law, and not Louisiana law, governs perfection, Daewoo's arguments that rely La. R.S. 10:9-310, which explains what is necessary to perfect a security interest under Louisiana law, are inapposite. But because Louisiana law does govern "the effect of perfection or nonperfection," other portions of the Louisiana Code are still implicated as to TKM's Brazilian security interest.  Specifically, La. R.S. 10:9-316, which

---

[106]   The Court notes that TKM seemed to have earlier taken the position espoused by Daewoo in its motion for summary judgment, that La. R.S. 10:9-301(2) applies.  *See* R. Doc. 570-26 at 10.  But because TKM correctly argues that 10:9-301(2) applies only to possessory security interests which are not at issue here, the Court applies 10:9-301(1) and 10:9-301(3) here.  Indeed, Daewoo seems to concede this is the correct approach.

deals with the "effect on perfection of change in governing law" remains in issue at this dispute.

### 2. *La. R.S. 10:9-316*

La. R.S. 10:9-316(a)(3) states that "[a] security interest perfected pursuant to the law of the jurisdiction designated in R.S. 10:9-301 [here, Brazil] . . . remains perfected until the earliest of . . . the expiration of one year after a transfer of collateral to a person that thereby becomes a debtor and is located in another jurisdiction."[107]   The statute also provides an attentive creditor an out:  if the creditor reperfects under the law of the jurisdiction where the collateral is moved within the year of transfer of the collateral, the creditor's interest remains perfected thereafter.  *See* La. R.S. 10:9-316(b).  But, should the creditor fail to reperfect within a year, the security interest "becomes unperfected and is deemed never to have been perfected." *Id.*

Daewoo argues that because TKM did not perfect its interest in the pig iron under Louisiana law in a timely manner, La. R.S. 10:9-316 renders TKM's interest unperfected.  TKM resists this conclusion with numerous arguments, each explored below.

---

[107]   The Court notes that La. R.S. 10:9-316(c), which deals with possessory security interests, is not at issue here given that TKM's lien is nonpossessory.

> i.   *The statute not designed to handle "contraband"*

In its opposition to Daewoo's motion for summary judgment, TKM argues—with no citation to any authority—that La. R.S. 10:9-316 is not applicable here because it is not designed to handle "contraband."   TKM drops this argument completely in its motion for summary judgment. Regardless of how TKM characterizes the transaction by which the cargo ended up in Louisiana, the Court rejects this as a basis for not applying La. R.S. 10:9-316.  The cargo was released from the Brazilian port by a Brazilian judge even though it was encumbered with a lien.   It was brought to Louisiana by AMT LLP to be sold to David J. Joseph Company, Inc., for legitimate business purposes.[108]   Moreover, the pig iron was not illegally stowed away in Louisiana where TKM could not locate it—TKM attached the cargo in December 2012.  The statute provided TKM nearly a year from that point to reperfect any security interest on the cargo, which it failed to do. And TKM has previously argued that, despite its current characterization of the pig iron as "contraband," La. R.S. 10:9-316 did apply.[109]   The Court therefore rejects this argument.

---

[108]   R. Doc. 570-21 at 3-5; R. Doc. 570-7 at 6; R. Doc. 570-9 at 41.
[109]   R. Doc. 570-26 at 11 (TKM brief arguing, in the context of its dispute with ABN, that once the pig iron arrived in Louisiana, a party was required to re-perfect pursuant to La. R.S. 10:9-316).

### ii. *The statute is not designed to handle non-possessory interests when the collateral is moved to a new jurisdiction*

TKM also argues that La. R.S. 10:9-316 does not apply because it is not designed to handle non-possessory interests.  TKM argues that because La. R.S. 10:9-316(c) states rules for when a *possessory* security interest is moved into a new jurisdiction, this is an indication that the statue was designed to only address possessory security interests, and not non-possessory security interests.  TKM further argues, and the Court has found, that TKM has a non-possessory security interest.  TKM therefore contends that the statute is inapplicable in on these facts.  But La. R.S. 10:9-316(c) is only a portion of the statute; Daewoo's argument is based in the language of La. R.S. 10:9-316(a), which makes no distinction between non-possessory and possessory security interests.  Because TKM's argument addresses a portion of the statute that all parties agree is inapplicable here, this argument fails.

### iii. *No legitimate transfer of ownership occurred*

TKM next argues that La. R.S. 10:9-316 does not apply because no legitimate transfer of ownership occurred.  The evidence establishes that COSIPAR transferred the pig iron to AMT LLP, for significant consideration, so that AMT LLP would sell it to David J. Joseph Company.[110]  TKM argues

---

[110]    R. Doc. 570-21 at 3-5; R. Doc. 570-7 at 6; R. Doc. 570-9 at 41.

that this transfer was a "sham transaction," as AMT LLP and COSIPAR are alter egos, and therefore no legitimate transfer of ownership occurred.[111]  But the UCC applies Section 9-316 to transfers between companies that are even more closely intertwined than AMT LLP and COSIPAR.  Indeed, the official examples in the UCC comment to the statute apply the statute where the same debtor reincorporates and transfers the property to itself.  *See* La. R.S. 10:9-316, Uniform Commercial Code Comment, Example 4.  And because the UCC recognizes that 10:9-316 can apply to unperfect an interest where companies are even more tightly bound that AMT LLP and COSIPAR, this argument is without merit.

iv.   *Any purported transfer did not create a debtor*

TKM next argues that La. R.S. 10:9-316 cannot apply because AMT LLP did not become a "debtor" when COSIPAR transferred the pig iron to it for the sale.  TKM reads the statute to require that a creditor-debtor relationship be created as between TKM and AMT LLP for the statute to function.  But TKM misreads the statute and understands the term "debtor" too narrowly.  As explained in the leading treatise on the UCC, "[a] sale to a third party in another state constitutes a 'transfer' that 'thereby' makes the buyer a debtor."

---

[111]    The Court notes, again, that the nature of this transaction did not prevent TKM from arguing that La. R.S. 10:9-316 applied to ABN, who was in an identical posture to TKM.  *See* R. Doc. 570-26 at 11.

White & Summers, *Uniform Commercial Code* § 31:46 (6th ed. 2019). This is because the UCC specifically defines debtor as a "person having an interest, other than a security interest or lien, in the collateral, whether or not the person is an obligor." La. R.S. 10:9-102(28).

v.   *The statute is not designed to benefit Daewoo*

TKM points to a comment to La. R.S. 10:9-316 to argue that the statute cannot function in Daewoo's favor because Daewoo has a judicial lien rather than a security interest. That comment states: "the security interest becomes unperfected prospectively and, against purchasers for value, including buyers and secured parties, but not as against donees or lien creditors, retrospectively." La. R.S. 10:9-316, UCC Comment 3.

Even assuming this comment provides proper guidance in light of the plain language of the statute,[112] it does not function to prevent Daewoo from relying on La. R.S. 10:9-316. This is because the statute specifically states that a security interest becomes unperfected as to buyers, or here, AMT LLP. AMT LLP's purchase acts as an intervening step that vitiates the application

---

[112]   The Louisiana Supreme Court has cast doubt that UCC comments which add to or contravene the plain language of the UCC section that is law are proper guidance to consider. *See First Nat. Bank of Picayune v. Pearl River Fabricators, Inc.*, 971 So.2d 302, 315 (La. 2007) (rejecting the guidance of a UCC comment in reliance on the plain language of La. R.S. 10:9-316).

of this comment to Daewoo, as Daewoo's lien is premised on its judgment against the *buyer*, AMT LLP, against whom the statute still applies.

The Court also takes note that TKM had a settlement agreement with AMT USA, not AMT LLP.[113]  Further, it sued AMT USA in Brazil,[114] in state court,[115] and in this Court.[116]  It therefore lacks a judgment or claim against AMT LLP, which is the owner of the pig iron at issue here.[117]

vi.  *Rights fixed by the judicial attachment*

TKM ends its assault on the applicability of La. R.S. 10:9-316 with a policy argument.  Comparing the statute to public records doctrine, TKM contends that the purpose of a reperfection requirement is to put parties on notice, and that its judicial attachment was more than sufficient to do that. TKM also contends that Daewoo, a party with a judicial lien and knowledge of TKM's purported interests, was not in the class of persons the rule is designed to protect.

This argument, though, runs straight into the teeth of the Louisiana Supreme Court's decision in *First Nat. Bank of Picayune v. Pearl River Fabricators, Inc.*, 971 So. 2d 302 (La. 2007).  There, the Louisiana Supreme

---

[113]  R. Doc. 637-3 at 12.

[114]  *Id.* at 40.

[115]  R. Doc. 69-1 at 200.

[116]  R. Doc. 69.

[117]  *See* R. Doc. 644-20 at 4-6.

Court held that the retroactive-lapse rule is strictly applied, and that "proper filing alone is dispositive." *Id.* at 316. Because of the plain language of the statute, the Louisiana Supreme Court specifically rejected the idea that policy implications, including that the contesting party had actual knowledge of the unrecorded interest, allowed a party who did not file a UCC statement to avoid the result of La. R.S. 10:9-316. *Id.* at 316-17. The Court therefore rejects TKM's policy arguments regarding the affect of the statute.

Having determined that La. R.S. 10:9-316 applies to the facts at issue, and given that it is undisputed that TKM filed its UCC statements more than a year after December 2012, the Court finds that even if TKM had a perfected security interest on the 9,000 tons of pig iron based on Brazilian law at one point, that perfection would have dissolved as a result of TKM's failure to reperfect pursuant to La. R.S. 10:9-316.

4. *Priority and Subordination*

Finally, TKM argues that even it does not have a perfected security interest, an unperfected security interest would also give it a superior interest to Daewoo's. TKM points to La. R.S. 10:9-322(h), which states that "a security interest has priority over a conflicting lien . . . in the same collateral except as otherwise provided in this chapter. . . ." Because the statute speaks

45

of "a security interest" and not "a perfected security interest," TKM argues it has priority over Daewoo's claim even if TKM's claim is unperfected.

The problem for TKM is that the statute contains an explicit carveout, whereby the rule applies "except as otherwise provided in this chapter." La. R.S. 10:9-322(h).  And the law does have other provisions that relate to judicial liens such as Daewoo's.  La. R.S. 10:9-117(a) provides that "a security interest . . . is subordinate to the rights of : . . . a person that becomes a lien creditor . . . before the interest . . . is perfected."  Moreover, La. R.S. 10:9-152(a)(52) states that "lien creditor" means "a creditor that has acquired a lien on the property involved by attachment, sequestration, seizure, levy, or the like."  Because Daewoo attached the pig iron before TKM filed its UCC statements, its interest primes any unperfected security interest of TKM.

### D.   Comity

Finally, TKM argues that principle of international comity compels a judgment in its favor.  Specifically, TKM asks that the Court recognize and enforce an *ex parte* order from a Brazilian Judge which created an attachment on the pig iron onboard the M/V CLIPPER KASASHIO before it was released.

While the pig iron was docked at the port in Itaqui, both ABN and TKM moved for attachments of the pig iron.  Attachments were granted by two

46

separate judges.[118]  Clipper Bulk, which owned the vessel, moved to have the ABN attachment released so that the ship could set sail.  The judge who had issued the ABN attachment released the ship, and it set sail for Louisiana.[119] ABN appealed the decision, but the appeals court dismissed the appeal as it lacked jurisdiction once the ship set sail.[120]  TKM then went to the judge who had issued its attachment, and requested a clarification from that judge that the ship had wrongfully set sail.  The judge issued such an order.[121]

TKM now argues that international comity requires that this Court "recognize and enforce the order of the Sao Paolo court entered on November 9, 2012 for the attachment of the pig iron on the Clipper Kasashio."[122] International Comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Derr v. Swarek*, 766 F.3d 430, 437 (5th Cir. 2014) (citing *Hilton v. Guyot*, 159 U.S. 113, 164 (1895)).  The Fifth Circuit has held:

---

[118]    R. Doc. 593-9 (TKM's attachment in Portuguese); R. Doc. 617-2 (same in English).

[119]    *See* R. Doc. 617-3.

[120]    R. Doc. 617-4.

[121]    R. Docs. 593-10 and 593-11 (Portuguese); R. Doc. 617-5 (English).

[122]    R. Doc. 593 at 27.

> Under the principles of international comity, a foreign court's judgment on a matter is conclusive in a federal court when (1) the judgment was rendered by a court of competent jurisdiction, which had jurisdiction over the cause and the parties; (2) the judgment is supported by due allegations and proof; (3) the relevant parties had an opportunity to be heard; (4) the foreign court follows the procedural rules, and (5) foreign proceedings are stated in a clear and formal record.

*International Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*, 347 F.3d 589, 594 (5th Cir. 2003).

TKM's argument regarding comity fails for several reasons.   First, TKM's argument seems to rely in part on the concept that the Sao Paulo Court retains prior exclusive jurisdiction over the pig iron.  TKM states that it is "simply asking that the Itaqui attachment be accorded the same respect as this court extended to the 24th JDC in its August 2016 Order and Reasons by extending comity to the Brazilian judge's attachment order . . . and hold that the doctrine of prior exclusive jurisdiction applies to the Itaqui attachment so that TKM is the first attaching creditor."[123]  Before now, TKM spent years and countless judicial resources arguing that it was the 24th JDC that had jurisdiction over the pig iron proceeds.[124]  Indeed, just months ago TKM filed a brief in which it stated that "TKM agrees with Daewoo that [this]

---

[123]   R. Doc. 593 at 29.

[124]   *See, e.g.,* R. Doc. 436-1.

court retains jurisdiction pursuant to the principle articulated in *Republic National Bank v. United States*, 506 U.S. 80 (1992), and the other cases cited by Daewoo."[125]   TKM is thus judicially estopped from arguing otherwise.[126] In any event, TKM's argument that the Sao Paulo court has prior exclusive jurisdiction is also wrong.   As the Brazilian Appeals Court recognized, once M/V CLIPPER KASASHIO set sail, the Brazilian courts lost jurisdiction over the pig iron.[127]

TKM's argument that comity requires recognition of the Sao Paulo attachment also fails because the court did not issue a "judgment" where the "relevant parties had an opportunity to be heard."   *International Transactions*, 347 F.3d at 594.   Indeed, Daewoo represents that it was not even aware of the proceedings in the Sao Paulo court.[128]   A fundamental element of the doctrine of international comity is therefore missing here.

TKM resists this conclusion by arguing that attachments are often *ex parte*.  Although this is true, it does not excuse the absence of an element the

---

[125]   R. Doc. 546 at 2.

[126]   Although the Court did not explicitly rely on TKM's brief in its Order and Reasons finding it retained prior exclusive jurisdiction because the brief was improperly filed by TKM's counsel, the Court did consider TKM's representations when crafting its decision, and thus judicial estoppel still applies.

[127]   *See* R. Doc. 617-4 (Feb. 6, 2013 Dismissal Order of Brazil Appellate Court).

[128]   R. Doc. 644 at 25.

Fifth Circuit requires to extend comity to foreign judgments.  Rather, it simply proves Daewoo's point that the doctrine of comity does not apply here and is ill-fitted to TKM's theory of the case.  The Fifth Circuit specifically cautioned against extending comity to *ex parte* rulings of foreign courts in *International Transactions.  See International Transactions*, 347 F.3d at 595-96.  TKM cites to no authority applying international comity to similar facts.  As such, the doctrine of comity does not require the Court to recognize the Sao Paulo court's order.

### E.    Priority

Based on the foregoing analysis, the conclusion of this case is straightforward.  Louisiana law states that "[t]o the extent not otherwise governed under Chapter 9 of the Louisiana Commercial Laws, a seizing creditor, by the mere act of seizure, acquires a privilege on the property seized, which entitles him to a preference over ordinary creditors."  La. C. C. P. art. 2292(A).  That provision continues:  "[w]hen several seizures of the same property are made by ordinary creditors, the seizing creditors acquire a privilege and are entitled to a preference among themselves according to the order of their seizures."  La. C. C. P. art. 2292(B).  Moreover, Article 3511 provides that "to the extent not otherwise provided under Chapter 9 of the Louisiana Commercial Laws, a creditor who seizes property under a writ of

attachment or of sequestration acquires a privilege from the time of seizure if judgment is rendered maintaining the attachment or sequestration."  La. C.C.P. art. 3511.

Here, Daewoo's December 22, 2012 seizure was before TKM's December 29, 2012 seizure.  Moreover, Daewoo has perfected its claim against AMT LLP by obtaining a $17.3 million judgment on its arbitration award and filing that judgment with a Louisiana court.  Daewoo's perfected, first-in-time interest therefore takes priority over TKM's.  Daewoo is therefore entitled to a judgment under Louisiana Code of Civil Procedure article 3510, which provides that "a final judgment must be obtained in an action where a writ of attachment or of sequestration has issued before the property seized can be sold to satisfy the claim."  Such a judgment will therefore issue from this Court.

## IV.   CONCLUSION

For the foregoing reasons, the Court grants Daewoo's motion for summary judgment and denies TKM's motion for partial summary judgment.

New Orleans, Louisiana, this __28th__ day of September, 2020.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE